Syllabus.

# Richmond.

## WILLIAMS V. COMMONWEALTH.

### November 18, 1920.

1. HOMICIDE—*Indictment in Common-Law Form—Plea of Guilty—Whether Confession of Murder in First Degree.*—To an indictment in the common-law form for murder, accused pleaded guilty. It was contended for the Commonwealth that the plea of guilty was a confession, not merely of murder, which under the practice in Virginia is presumed to be murder in the second degree, but of murder in the first degree, and that therefore the Commonwealth was relieved from the burden of introducing any evidence to elevate the degree of the crime to murder in the first degree.

   *Held:* That as the court below did not rest its judgment as to the degree of the murder upon the plea of guilty, but upon the evidence in the case, and since that evidence was sufficient to sustain the finding, it was unnecessary for the Supreme Court of Appeals to pass upon the correctness or incorrectness of this contention.

2. HOMICIDE—*Murder in the First or Second Degree—Intent.*—Whether a homicide is murder in the first or second degree depends upon the intent of the prisoner at the time of the killing. The object of the rules of law and evidence is to ascertain beyond a reasonable doubt the state of the prisoner's mind at the time of the murder. In other words, the difference between murder in the first and murder in the second degree turns upon whether the homicide was wilful, deliberate and premeditated or not.

3. HOMICIDE—*Common-Law Indictment for Murder—Whether on Plea of Guilty Accused Can be Found Guilty of Manslaughter.*—Where upon a plea of guilty to an indictment in common-law form for murder, the trial court considered the evidence as bearing on the degree of the crime, and concluded that the evidence showed beyond a reasonable doubt that the accused was guilty of murder in the first degree, such finding, if warranted by the evidence, concluded against the accused the degree of the crime, and in fact determined that upon the evidence the crime of the accused was not that of man-

slaughter, and rendered futile and needless any inquiry as to whether the accused, notwithstanding his plea of guilty, could have been found guilty of manslaughter.

4. HOMICIDE—*Evidence—Other Crimes.*—Upon an indictment for the murder of a plain clothes policeman, the matter in issue was the motive of the accused in committing the homicide for which he was on trial; that is to say, whether the homicide was in self-defense, or in resisting an unlawful arrest without a warrant, or because accused knew, or feared, that he might be arrested on the charge of other offenses elsewhere, and had formed the deliberate purpose to kill, if necessary to avoid such arrest. The chief of police testified that he had received information that accused was wanted for murder in another State, and had told deceased to watch out for him.

*Held:* That this testimony was admissible.

5. HOMICIDE—*Evidence—Possession of Weapon.*—Upon a prosecution for homicide, by shooting with a pistol, evidence that accused three or four weeks before the homicide displayed a large pistol which he said was "his friend,". and that about the same time accused loaned his pistol to a witness to use on the stage of a theater and showed the same pistol to some men in the dressing room of a theatre, was admissible, upon the question of premeditation.

6. HOMICIDE—*Evidence—Possession of Weapon.*—The previous possession by the slayer of the weapon with which a homicide is committed is a material circumstance bearing on the question of whether the killing was premeditated. The length of time of such previous possession is material evidence bearing on the same subject.

7. HOMICIDE—*Cross-Examination—Self-Incrimination.*—On a prosecution for homicide, counsel for the Commonwealth, on cross-examination, asked the accused ·if he did not know that he was wanted in another State for murder, and the accused was required to answer such question, which he did by saying that he did not know that he was wanted there or anywhere else for doing any shooting. This question and answer were obodjected to as tending to incriminate accused.

*Held:* That even if the accused had admitted such knowledge, it would not have incriminated him, so far as being guilty of murder in the other State. And in so far as the killing of the deceased was concerned the accused took the risk of incriminating himself when he took the stand and testified as ·a witness in the case.

8. CRIMINAL LAW—*Cross-Examination of Accused.*—Where accused takes the stand as a witness he subjects himself to the same

rules of cross-examination which are applicable to all witnesses.

9.  WITNESSES—*Cross-Examination—Scope.*—A witness may be cross-examined upon any testimony given by him in chief.

10. HOMICIDE—*Evidence—Cross-Examination of Accused.*—On a prosecution for the murder of a plain clothes policeman, accused had testified in chief to the effect that, prior to the killing of the deceased, he had no idea or suspicion that his arrest was being sought; that he shot solely in self-defense.

    *Held:* That upon cross-examination, accused might be asked if he did not know that he was wanted in another State for murder, the question being relevant to the facts testified to by the accused in chief, and therefore, under the most restricted rule of practice, a proper question. Moreover, the question tended to test the veracity or credibility of the witness, and hence, on that ground also, was a proper question.

11. HOMICIDE—*Evidence—Rebuttal.*—Accused in a prosecution for murder of a plain clothes policeman had testified that prior to the killing of deceased that he had no idea that his arrest was being sought, that he did not know that he was wanted in Greenville or anywhere else for doing any shooting, and that he shot solely in self-defense. In rebuttal a witness for the Commonwealth testified to the effect that the accused told him that he had done some shooting in Greenville, and that he "didn't want to go to Greenville for trial, but preferred to be tried in Lynchburg."

    *Held:* Admissible.

12. HOMICIDE—*Murder—Burden of Proof—Intent to Kill.*—Under Code of 1919, section 4393, in order to elevate the crime of murder to murder in the first degree, the burden is upon the Commonwealth to show not only that the killing was done with malice aforethought, but also that the homicide was committed with the intent to kill, not merely to do great bodily harm.

13. HOMICIDE—*Murder in the First Degree—Intent to Kill.*—The intent to kill need not be directed against any specific person. If it be an intent to kill any person who may attempt a certain thing, and one is killed because he attempted that thing, the intent is the same as if it were directed against that specific person.

14. HOMICIDE—*Murder in the First Degree—Intent to Kill.*—While the intent to kill need not exist for any particular length of time before the homicide, in order to constitute murder in the first degree, when the evidence shows that such intent did in fact exist for several weeks before the homicide, it of

course makes a plainer case of "deliberate and premeditated" killing, or of murder in the first degree.

15.  HOMICIDE—*Murder in the First Degree—Sufficiency of Evidence —Case at Bar.*—In the instant case, a prosecution for the murder of a plain clothes policeman, the evidence beyond a reasonable doubt showed that the accused had fled from South Carolina to avoid arrest upon charges so serious that he preferred standing trial in Lynchburg for the murder of the policeman to being taken to South Carolina for trial on these charges; that for three or four weeks he had been in Lynchburg, fearing arrest upon the South Carolina charges; that he had reflected upon his situation, and deliberately determined to kill any one who attempted to arrest him, if necessary to prevent his arrest; that during this period accused habitually kept himself armed, in order to effectuate that purpose; that during the period preceding the killing of deceased accused had harbored in his mind such predetermined purpose to kill; and that, although he was wild and excited when the occasion arrived, his shooting of the deceased was in no way caused by his excitement, or by impulse of passion, or by provocation at the time, but was done in execution of his predetermined purpose to kill to avoid arrest.   There were other circumstances in evidence which led to no other reasonable conclusion than that just stated.

*Held:* That the evidence was sufficient to support a conviction of murder in the first degree.

Error to a judgment of the Corporation Court of the city of Lynchburg.

*Affirmed.*

In this case the accused was indicted at the May term, 1920, of the trial court for the murder of one L. A. Mann, as follows:

"The jurors of the Commonwealth of Virginia in and for the body of the city of Lynchburg, and now attending the corporation court for the said city, upon their oath present: That John H. Williams, *alias* Joe Turner, *alias* Lee Jordan, *alias* Slim, on the 25th day of March, in the year 1920, within the said city, in and upon one L. A. Mann, then and there being, feloniously, wilfully, and of his malice afore-

thought, did then and there make an assault; and that the said John H. Williams, *alias* Joe Turner, *alias* Lee Jordan, *alias* Slim, with a certain pistol, then and there charged with gunpowder and leaden ball, which said pistol he, the said John H. Williams, *alias* Joe Turner, *alias* Lee Jordan, *alias* Slim, in his right hand then and there had and held, did discharge and shoot off at, against, and upon the said L. A. Mann; and that the said John H. Williams, *alias* Joe Turner, *alias* Lee Jordan, *alias* Slim, with the leaden ball aforesaid, out of the pistol by the said John H. Williams, *alias* Joe Turner, *alias* Lee Jordan, *alias* Slim, discharged and shot off as aforesaid, then and there, feloniously, wilfully, and of his malice aforethought, did strike, penetrate, and wound him, the said L. A. Mann, in and upon the side of the head, brain, and arteries of the head of him, the said L. A. Mann, giving to him, the said L. A. Mann, then and there, with the leaden ball aforesaid, so as aforesaid discharged and shot off out of the pistol aforesaid by the said John H. Williams, *alias* Joe Turner, *alias* Lee Jordan, *alias* Slim, in and upon the side of the head, brain, arteries of the head of him, the said L. A. Mann, one mortal wound, of which said mortal wound he, the said L. A. Mann, then and there, from the 25th day of March, in the year 1920, to the 26th day of March, in the year 1920, in the city aforesaid, did languish, and so languishing did live, on which said 26th day of March, in the year 1920, he, the said L. A. Mann, in the city aforesaid, of the said mortal wound died. And so the jurors aforesaid, on their oath aforesaid, do say that the said John H. Williams, *alias* Joe Turner, *alias* Lee Jordan, *alias* Slim, him, the said L. A. Mann, in the manner and by the means aforesaid, feloniously, wilfully, and of his malice aforethought, did kill and murder, against the peace and dignity of the Commonwealth of Virginia."

Upon this indictment the accused was arraigned and upon his arraignment tendered in person a plea of guilty. There-

upon, with the consent of the attorney for the Commonwealth entered of record, the court proceeded to hear and determine the case without the intervention of a jury. Whereupon, after the evidence and arguments of counsel were fully heard, the court found the accused guilty of murder in the first degree, fixed his punishment at death and accordingly entered judgment and sentenced the accused to suffer the penalty of death by electrocution.

The material evidence introduced in the case as certified in the record, is as follows:

E. C. Wheeler, testified in substance as follows:

"I am a member of the Lynchburg police force and have been for nearly six years. For a great part of that time I have served as a 'plain clothes man,' and was so serving at the time of the shooting charged in the indictment.

"A night or two before the shooting, which occurred in the city of Lynchburg, at the corner of Eighth and Main streets, about eight o'clock in the evening of March 25, 1920, it was reported to me and Mr. L. A. Mann, who was also a 'plain clothes man' of the Lynchburg police force, that this defendant, who was known to us as 'Slim,' or the man with the music box or guitar, was carrying a gun and that he even slept with it. The night of the shooting Mann and I met at the corner of Twelfth and Main streets about 7:30 and talked about the matter. We had almost decided that he was the man wanted in Greenville, South Carolina, and we decided to arrest him for carrying the gun and hold him for investigation. We walked up Main street to Eighth and were standing there on the corner next to the Western Union office, talking together and with Len Honig, who is a special officer for the Glamorgan works, when we saw this man 'Slim' coming up Main street from the direction of Ninth, with his music box under his arm. When he reached us, and started to pass on by us, we stopped him and asked him where he worked. He said 'at the Thornhill

wagon works.' Mr. Mann asked him about the gun and he said he left it at home. He appeared wild and excited and aimed to whirl and run. He dropped the guitar as he started to run and we became satisfied that he was the man wanted in South Carolina. We grabbed him and attempted to hold him. I had hold of his right hand and arm, with my left hand under his elbow and holding his right hand with mine, and Mr. Mann had hold of his left arm. He made a wrench and I thought he was getting hold of me. He got his left hand loose from Mr. Mann and just after that I was shot. The whole thing occurred in thirty or forty seconds. The last thing I remember was that he had his head in Mr. Mann's chest and then I was shot. I was struck by the first shot which wounded me in the neck. I was knocked down and blinded by it, and fell at his feet with my head down Eighth street. I could not move but could see and hear. I heard a report and Mann fell. When Mr. Mann was shot the negro was standing out in the driveway near my head. I am sure it was the negro who shot me. Nobody had attempted to shoot him before I was shot, but Mr. Honig had gotten his gun out and was asking 'Must I shoot him,' and we said, 'No.' Three shots were fired before Mr. Honig began shooting, the first shot struck me and the second one Mr. Mann. I am sure it was the negro who shot me, but I did not see either of the shots fired. I never got my hand on my own gun at all. We used no violence in attempting to arrest the negro, but just took hold of him. We made no effort to draw our weapons. About two weeks before the shooting Chief Seay had called us in his office and told us the man wanted for the Greenville shooting was here and to look out for him. We did not have any warrant for his arrest, but decided to arrest him for carrying a concealed weapon and hold him for investigation as we were almost sure he was the man wanted for the Greenville shooting. One reason why we did not have a warrant was that

we did not know his name, but only knew him as 'Slim.' When we stopped him we did not tell him we were officers or display any badge, or other emblem of authority. We were all dressed in plain citizens clothes and not in uniform. We did not tell him he was under arrest, but just took hold of him. I am sure he knew we were officers though as I had seen him in a house on Fourteenth street about two months before the shooting when I went there to make some inquiries about another party."

Dr. E. Barksdale, testified in substance as follows:

"I am the physician in charge at the Lynchburg city hospital. On the night of March 25, 1920, Mr. L. A. Mann was brought to the hospital unconscious, suffering from a pistol bullet wound through the head. The bullet went through the skull and brain, entering just a little above and in front of the head near the top. He never regained consciousness and made no statement. He died the next morning from the effects of this wound."

Miss B. Turner, testified in substance as follows:

"I am nurse at Lynchburg hospital and was present when Mr. L. A. Mann died on the morning of March 26th at 7:30 o'clock. He died at the Lynchburg hospital in room sixteen, having never regained consciousness after being brought to the hospital."

John M. Seay, testified in substance as follows:

"I am chief of police of Lynchburg, I had received information that the man who was wanted for murder of two policemen in Greenville, South Carolina, was in Lynchburg. I told Mann and Wheeler to watch out for him and I wanted him caught. The only name I could get was 'Slim.'"

Len Honig, testified in substance as follows:

"I am a special police officer for the Glamorgan works. I met Wheeler and Mann at the corner of Eighth and Main streets about eight o'clock the evening of the shooting. Mr. Mann said, 'Here comes Slim. Let's get that big gun he's

**89**

got.' They stopped him and said 'Slim, where's that big gun?' He said 'I left it at my room.' They said 'Where's your room?' He said 'Down the street.' They asked him where he was working and he said at Thornhill's. He made a break to run away, and they grabbed hold of him. It popped in my mind that the nigger had a gun, and I changed mine to my coat pocket. Just as he started to run a guitar dropped from under his arm. I asked the question 'Must I shoot?' when they grabbed him and they said 'No.' He fired three shots before I could shoot. The first one struck Wheeler, the second one hit Mann, and the third one just missed me, I ducked just as he fired and the shot went over my head, but the powder got in my eyes and blinded me. When I could see I fired four shots at the negro, who was then running down the street, I saw a gun but couldn't tell at first whether Mann, Wheeler or the negro had it. When I saw the gun coming I said 'Must I shoot?' but I didn't know who had the gun. After Slim shot detective Mann he shot at me. God is my judge, I didn't fire the first shot. Nothing was said to the negro about our being officers or trying to arrest him."

Bruffey Trent, testified in substance as follows:

"I am the manager of the Trenton Theatre. About three or four weeks before the shooting this negro 'Slim' was in the dressing room of my theatre, playing and singing for some of the performers. I saw him display a large pistol which he said was 'his friend.'"

Charles Christian, testified in substance as follows:

"I run a motion picture for colored people on Fifth street. Three or four weeks before the shooting Slim loaned me his pistol to use on the stage. On another occasion I saw him show it to some men in the dressing room of the Trenton Theatre."

The accused, testified in substance as follows:

"I had started to Jim Nicholas' house in Rivermont. These

men stopped me on the corner of Eighth and Main and began to question me about where I lived and where I worked. I told them I worked at Thornhill wagon works, and one of them said 'You are a damn liar.' I turned to walk away and they grabbed hold of me. The little man (Honig) said 'I am going to shoot him.' He did not say 'Must I shoot,' but 'I am going to shoot him.' The little man shot twice at me before I shot at all. The pistol was sticking in my pants under my sweater. I shot with my left hand. I was not trying to kill anybody but only to get away. I did not know the men were officers or detectives or that they were trying to arrest me. I don't remember ever seeing any of them before that night. When they stopped me I first thought maybe they wanted me to play and sing for them as I had my guitar with me. That little man was the first to draw a gun. He shot at me twice before I shot. I got the pistol when I was in the army and sometimes I carried it slung from my shoulder with a strap. I came to Lynchburg about the first of last December. I did not always carry the gun, but I did sometimes when I was going somewhere at night. I carried it that night because I was going over to Rivermont and going about that way I didn't know who might bother me. When I was arrested in Toledo the men that arrested me searched me but didn't find the gun and I gave it to them myself after we got to the stationhouse. The night of the shooting these men who stopped me didn't ask me about the gun, but one of them said 'He's got a gun.' I didn't know I was wanted in Greenville or anywhere else for doing any shooting. After the shooting I went to Jim Nicholas' house in Rivermont and got a cap. I didn't say anything there about the shooting. When I shot I wasn't trying especially to shoot anyone. I was just trying to get loose. I didn't tell Mr. Tankersley when he was bringing me back to Lynchburg that I had shot two men in Greenville, S. C."

"The large army pistol, about twelve inches long, was produced with holster and strap and string attached to it, as it was taken from him in Toledo. Slim stated that this was the pistol and that when it was in the holster in the strap it hung in the small of his back, but he denied that the string was to pull it from side to side and said it had only been put there after the shooting. He denied that he had been trained to shoot with either hand and said he was a poor shot."

### REBUTTAL.

No further witnesses being called for the defense C. N. Tankersley,. testified in substance as follows:

"I am a 'plain clothes man' on the local police force. I helped to bring 'Slim' back from Toledo, Ohio, where he was arrested. I asked him if he had not killed two policemen in Greenville, S. C. He told me he had done some shooting in Greenville, South Carolina, but did not say he had shot any policemen or killed anybody. He said he didn't want to go to Greenville for trial, but preferred to be tried in Lynchburg."

In the opinion of the trial court, which is a part of the record, there is this statement: "Under the law of the State of Virginia, the defendant's plea of guilty is to the crime of murder, and manslaughter is not, therefore, involved in the case. The duty of the court is to decide whether the crime committed * * * is murder in the first or second degree, and this depends upon the intent of the prisoner at the time of the killing."

*Don P. Halsey*, for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile*, for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

[1] The indictment is in the common-law form of an indictment for murder as that crime has been known at common law since the statute of 23 Hen. 8, c. 1, sec. 3, 2 Bish. New Cr. Law (8th ed.), secs. 627, 672-677; 2 Bish. New Cr. Procedure (4th ed.), sec. 540-547, 561-565; *Livingstone's Case,* 14 Gratt. (55 Va.) 592.

It is contended by the Attorney-General that this is an indictment for murder in the first degree and that the plea of guilty was a confession, not merely of murder, which under the practice in Virginia is presumed to be murder in the second degree, but of murder in the first degree, and that such confession of itself warranted the finding of the trial court that the accused was guilty of murder in the first degree and that the Commonwealth in such case, under section 4919 of the Code, is relieved from the burden of introducing any evidence to elevate the degree of the crime to murder in the first degree; that it is, therefore, unnecessary for us to enquire whether the finding and judgment under review in so far as the degree of the murder is concerned, was or was not sustained by the evidence. Of this position we deem it sufficient to say that the court below did not rest its finding or judgment as to the degree of the murder upon the plea of guilty, but upon the evidence in the case; and since, upon a review of that evidence, we think it was sufficient to sustain such finding and judgment it is unnecessary for us to pass upon the correctness or incorrectness of such position of the Attorney-General.

[2, 3] On the other hand it is contended for the accused by counsel, who has ably defended this case both in the court below and before us, that section 4919 of the Code should be read along with section 4900 of the Code and the other sections expressly mentioned in the latter, especially

section 4920, and that, notwithstanding the plea of guilty, the trial court "had the power and was charged with the duty of determining the degree of the homicide, not only as to murder, but also as to manslaughter, if the evidence justified it." And for the accused the position is taken that the evidence did not warrant a finding of the accused guilty of any offense of a higher degree than manslaughter; that the trial court therefore was in error in its opinion that "manslaughter is not involved * * * in the case" and was likewise in error in its further opinion that the only "duty of the court (was) to decide whether the crime committed * * * is murder in the first or second degree." However this may be, the learned judge of the trial court further stated in his opinion that whether the crime committed by the accused is murder in the first or second degree "depends upon the intent of the prisoner at the time of the killing. The object * * * of the rules of law and evidence is to ascertain beyond a reasonable doubt the state of the prisoner's mind at the time of the murder. In other words, the difference between murder in the first and murder in the second degree turns upon whether the homicide was wilful, deliberate and premeditated or not." The correctness of this statement of the law is not questioned by counsel for the accused, and it is, indeed, too well settled to admit of question. And since the trial court considered the evidence as bearing on the degree of the crime and concluded that the evidence showed beyond a reasonable doubt that the accused was guilty of murder in the first degree, such finding, if warranted by the evidence, concluded against the accused the degree of the crime; did in fact determine that upon the evidence the crime of the accused was not that of manslaughter; and rendered futile and needless any inquiry as to whether the accused, notwithstanding his plea of guilty, could have been found guilty of manslaughter. We consider, therefore, that the position taken for the accused above

mentioned presents a question which is not involved in this case and hence it will not be here passed upon.

The assignments of error raise the following questions, however, which will be passed upon in their order as stated below.

[4] 1. Did the trial court err in refusing to exclude the testimony of John. M. Seay, chief of police of Lynchburg, which was as follows: "I had received information that the man who was wanted for murder of two policemen in Greenville, South Carolina, was in Lynchburg. I told Mann and Wheeler to watch out for him and I wanted him caught. The only name I could get was 'Slim.' "

The accused by counsel objected to this testimony and moved to exclude it on the ground that it was "hearsay, irrelevant, indefinite and otherwise improper and incompetent." The court overruled the objection and motion and permitted this testimony to remain in evidence.

We are of opinion that the trial court committed no error in the action in question.

The guilt or innocence of the accused of the alleged crimes in South Carolina was not involved in the case at bar. But the questions of fact which were material and which were in issue in the case were whether the accused was being sought to be arrested by the police in Lynchburg on the charges of other crimes, and whether the accused, before he did the shooting for which he was being tried feared or apprehended arrest and had determined to kill any one attempting his arrest if necessary in order to prevent it.

The matter in issue was, what was the motive of the accused in committing the homicide for which he was on trial? Was it in self-defense merely to repel an assault upon him, as he claimed it was in his testimony? Was it in resisting an arrest because it was without a warrant and hence unlawful, as asserted in argument in his defense. Or was it because he knew, or feared or apprehended, before the homi-

cide, that he might be arrested in Lynchburg on the charge of other offenses elsewhere and had formed the deliberate purpose to kill if necessary to avoid any arrest, however lawful the arrest might be in itself?

Upon this issue, the fact that the arrest of the accused on the charge of other crimes elsewhere was being sought by the police of Lynchburg at the time was a material fact, which it was incumbent upon the Commonwealth to prove, before it could introduce evidence tending to show that the accused knew or suspected that such was the fact and that he acted at the time of the homicide upon the deliberate purpose previously formed to kill to avoid any arrest. The Commonwealth could not reasonably urge that the accused knew or suspected the existence of a fact without first proving the actual existence of it.

[5] 2. Did the trial court err in refusing to exclude the testimony of Bruffey Trent and Charles Christian; that of Bruffey to the effect that about three or four weeks before the homicide the witness saw the accused, in the dressing room of the Trenton Theatre, display a large pistol which he said was 'his friend;' and that of Christian to the effect that about the same time before the homicide the accused loaned his pistol to the witness to use on the stage of a theatre and that the witness also saw the accused show the same pistol to some men in the dressing room of the Trenton Theatre.

The accused by counsel objected to this testimony as "irrelevant and otherwise incompetent" and moved the court to exclude it, but the court overruled the objection and motion and permitted this testimony to remain in evidence.

We are of opinion that the trial court committed no error in such action.

[6] It is well settled that the previous possession by the slayer of the weapon with which a homicide is committed is a material circumstance bearing on the question of

whether the killing was premeditated. The length of time of such previous possession was material evidence bearing on the same subject. Hence the evidence in question was material and properly admitted.

[7-10] 3. Did the trial court err in overruling the objection of the accused by counsel to the question asked the accused by counsel for the prosecution on cross-examination of the accused, "if he" (the accused) "did not know that he was wanted in Greenville for murder," and in requiring the accused to answer such question, which he did by saying, "I didn't know I was wanted in Greenville or anywhere else for doing any shooting." And did the court further err in overruling the motion of the accused by counsel to exclude such answer on the ground "that it might tend to incriminate him," and in permitting such answer to remain in evidence?

The question was not whether the accused had committed murder in Greenville; but, in substance, whether prior to the killing of the deceased, Mann, the accused knew that his arrest was being sought upon the charge that he had committed murder in Greenville. Even if the accused had admitted such knowledge it would not have incriminated him, in so far as being guilty of any Greenville murder was concerned. And in so far as the killing of the deceased, Mann, was concerned the accused took the risk of incriminating himself when he took the stand and testified as a witness in the case, he thereby subjected himself to the same rules of cross-examination which are applicable to all witnesses. One of those rules is that a witness may be cross-examined upon any testimony given by him in chief. The accused had among other things testified in chief to the effect that prior to the killing of the deceased, he (the accused) had no idea or suspicion that his arrest was being sought. That he shot solely in self-defense, in order to escape from an assault upon him, and because Honig first shot twice at him.

90

The question objected to, being on cross-examination and being relevant to the facts testified to by the accused in chief, was, therefore, under the most restricted rule of practice (Stephen's Dig. of Law of Ev. p. 184), a proper question. Moreover, the question tended to test the veracity or credibility of the witness, and, hence, on that ground also was a proper question. See authority last cited p. 185. The answer to the question was, indeed, on the face of it, in favor of the accused. But in any view of it, it was responsive to the question and was upon a material issue of fact in the case, so that the answer was properly permitted to remain in evidence.

[11] 4. Did the trial court err in refusing to exclude the testimony of G. N. Tankersley, put upon the witness stand by the Commonwealth in rebuttal, to the effect that the accused told the witness that he "had done some shooting in Greenville, South Carolina," and that he "didn't want to go to Greenville for trial, but preferred to be tried in Lynchburg;" in overruling the objection of the accused by counsel to such testimony on the ground that "it was irrelevant, was not competent in rebuttal and was otherwise improper and incompetent;" and in permitting such testimony to remain in evidence?

We are of opinion that the trial court committed no error in such action.

This testimony was directly in rebuttal of the testimony of the accused mentioned in connection with the question next above decided, namely, that he "didn't know (he) was wanted in Greenville or anywhere else for doing any shooting." And while it contradicted the latter testimony, that, as is well settled, was no objection to it, as such contradiction was upon an issue of fact which was a material one in the case, as aforesaid.

There remains but one other question for our decision raised by the assignments of error and that is this:

5. Was the evidence in the case sufficient to sustain the finding of the trial court that the accused is guilty of murder in the first degree? .

This question must be answered in the affirmative.

In a majority of the States an officer has no authority to arrest, without a warrant, a fugitive from justice from another State or country. 5 C. J. p. 410; 2 Am. & Eng. Ency. of Law p. 882. The question is an open one in Virginia and it is unnecessary for us in this case to decide it, for the reason that it clearly appears from the testimony of the accused that no lack of authority of the officers who attempted to arrest him influenced his conduct in any way.

For the same reason it is unnecessary for us to consider in this case the degree of the criminality of a killing in the *bona fide* resistance of an unlawful arrest by officers or private persons induced by the fact or the belief on the part of the accused that the attempted arrest is unlawful. In *Briggs' Case,* 82 Va. 554, relied on for the accused the slayer "called for the officer's badge and denied his right to make the arrest." We think that neither that case nor *Muscoe's Case,* 86 Va. 443, 10 S. E. 534, also relied on for the accused, is applicable to the case now before us.

Further: We think, as we shall develop more fully below, that it appears from the evidence in this case beyond a reasonable doubt that the killing of the deceased, Mann, was "of malice aforethought," so that it was murder at common law, and under our statute (Code 1919, sec. 4393) which divides murder at common law into two degrees, it was at the least murder in the second degree.

It remains therefore for us to enquire merely whether the evidence is sufficient to sustain the finding of the court below that the homicide was murder in the first degree.

[12] Now under our statute aforesaid in order to elevate the crime of murder to murder in the first degree, the burden is upon the Commonwealth to show not only that the

killing was done with malice aforethought, but also that the homicide was committed with the intent to kill, not merely to do great bodily harm.   In discussing such statute, and those of similar import in other States, the following is said in 2 Bish. New Cr. Law (8th ed.), sec. 728, p. 420; "The doctrine to which most of the States have arrived is that the intent to take life is the distinguishing feature of murder in the first degree   *   *   *"   As said in *McDaniel's Case,* 77 Va. 281, at p. 284: "Now to constitute a 'wilful, deliberate and premeditated killing,' it is necessary that the killing should have been done on purpose, and not by accident, or without design; that the accused must have reflected with a view to determine whether he would kill or not, and that he must have *determined to kill* as the result of that reflection, before he does the act—that is to say, the killing must be a pre-determined killing upon consideration,   *   *   *   and that the design to kill need not have existed for any particular length of time, it may be formed at the moment of the commission of the act," citing a number of Virginia cases; and again, at p. 286 of 77 Va.   "The prisoner certainly killed the deceased, and it is equally certain that it was not accidentally done by him.  But this is not enough to constitute a case of murder in the first degree. Before we can pronounce him guilty of murder in the first degree we must be able to find, in the certificate of the facts, proof, direct or inferential, sufficient to justify the jury in coming to the conclusion that the death of the deceased was the ultimate result which the concurring will, deliberation and premeditation of the prisoner sought.  *Jones' Case,* 1 Leigh (28 Va.) 611. If we fail to find this measure of proof, the case falls short of murder in the first degree.   For it is laid down and believed to be undoubted law, that in all cases of slight and insufficient provocation if it may be reasonably inferred from the weapon made use of, or the manner of using it, or from any other circumstances, that

the party intended merely to do some great bodily harm, such homicide will be murder in the second degree, in like manner as if no provocation had been given, but not a case of murder in the first degree.   Davis' Cr. Law 99."

[13] This intent to kill need not be directed against any specific person.   If it be an intent to kill any person who may attempt a certain thing, and one is killed because he attempted that thing, the intent is the same as if it were directed against that specific person.   See note to Code 1919, section 4393 and authorities cited for the principle involved in this statement.

[14] Now while the intent to kill need not exist for any particular length of time before the homicide in order to constitute murder in the first degree; when the evidence shows that such intent did in fact exist for several weeks before the homicide it of course makes a plainer case of "deliberate and premeditated" killing, or of murder in the first degree under those terms of the statute.

Applying to the facts of the case the rules of law mentioned we have reached the following conclusions:

The provocation for the homicide consisted merely in this:   There had been no assault or threat of any sort against the accused before he "appeared wild and excited and aimed to whirl and run."   He had merely been questioned as to where he worked and about whether he carried a concealed weapon, a pistol.   Then, he started to run, when there was no reason therefor indicated by the evidence, except a purpose to avoid any arrest.   It was then that Mann and Wheeler grabbed him and attempted to hold him. Wheeler took hold of his right hand and arm, with Wheeler's left hand under his elbow and Wheeler's right hand holding his right hand.   Mann took hold of his left arm.   Thereupon Honig, who was with Mann and Wheeler, thinking the accused had a pistol, changed his pistol from some place about his person not disclosed by the evidence to his coat pocket

and said "Must I shoot?" Both Wheeler and Mann replied "No." No unnecessary violence was used in attempting to arrest the accused; Wheeler and Mann merely took hold of him as aforesaid and neither of them made any effort to draw their weapons, as Wheeler expressly testified. Even if the accused saw Honig change his pistol to his coat pocket, the accused had been assured, by the reply of both Wheeler and Mann to Honig's question and by the manner in which Wheeler and Mann were acting, that he was merely being arrested, and that he (the accused), was in no danger of being shot or suffering any other personal violence than that of being arrested. Thereupon the conduct of the accused was as follows: Without questioning the legality of the arrest or inquiring what it was for, he wrenched his left hand loose from Mann, with that drew a large army pistol concealed about his person, which he had had in his previous possession certainly for several weeks, and with the same hand shot Wheeler through the neck, causing Wheeler to fall and let go his hold of the accused. The accused was then free of the hold of both Wheeler and Mann. The accused then shot Mann through the head, inflicting the mortal wound from which Mann died the next day. The accused then fired a third shot, aimed at the head of Honig, who "ducked just as he" (the accused) "fired, and the shot went over" Honig's head, the powder going into Honig's eyes and blinding him temporarily. The accused then fled down the street. Honig, as soon as he recovered from the blinding flash of the powder aforesaid, fired four shots at the accused, all of which missed him. The accused thereafter made his escape from the State and was arrested in Toledo, Ohio, from whence he was brought back to Virginia. Upon that arrest, the men who arrested him searched him but did not find any pistol on him. He, however, then had about his person the same army pistol with which he killed the deceased, Mann, which was about twelve inches long,

and which the accused carried in a holster which hung by a strap in the small of his back, with a string attached by which he could pull the pistol from side to side and use it with either the right or left hand as occasion required. There is no direct testimony as to how the accused carried the pistol on the occasion of the homicide involved in this case, except that he testified that "The pistol was sticking in my pants under my sweater;" and he also testified to the effect that the pistol hung in the small of his back only when it was in the holster and he denied that the string was for the purpose of pulling it from side to side, and said that the string had only been put there after the shooting of Mann. But, in view of the conflict of nearly every statement of the accused with the other testimony in the case, the trial court was fully warranted in concluding from the circumstantial evidence on the subject that the accused carried his pistol aforesaid in the peculiar and deliberately arranged manner aforesaid on the occasion of the shooting of the deceased, Mann.

The provocation aforesaid was plainly inadequate to be reasonably considered as the inciting cause of the conduct of the accused aforesaid. After giving every reasonable consideration of such provocation in the most favorable aspect for the accused, which the overwhelming trend of the evidence permits, it was nothing more and in truth appeared nothing more to him than an orderly arrest supposed by him to be lawful; and the reasonable mind, in the search for the real motives for the conduct of the accused, is forced to look to the evidence for some other motive. And from the character of the weapon used; from the manner in which it was carried prior to the shooting of the deceased; the reckless and deadly manner in which, and the circumstances under which the shooting was done, we feel that the trial court was warranted in concluding that the evidence established beyond a reasonable doubt, that the killing

sprung from a preconceived purpose and not from passion excited by the inadequate provocation; that the shooting of the deceased was done by the accused with malice and with the added intent to kill, not merely to do great bodily harm, and in inferring under the circumstances of this case that the killing of the deceased was wilful, deliberate and premeditated and hence murder in the first degree.

[15] The evidence beyond a reasonable doubt, warrants the inferences that the accused had fled from South Carolina to avoid arrest upon the charges of committing crimes there and charges so serious that he preferred standing trial in Lynchburg for the offenses aforesaid committed there, to being taken to South Carolina for trial for the offenses committed there; that for three or four weeks at least he had been in Lynchburg fearing arrest upon such last named charges; that he had reflected upon his situation and deliberately determined to kill any one who attempted to arrest him, if necessary to prevent his arrest; that during said period before the killing of the deceased, Mann, the accused habitually kept himself armed in the peculiar manner aforesaid in order to be ready to effectuate that purpose if the need so to do should arise; that during such time preceding the killing of the deceased the accused had harbored in his mind such predetermined purpose to kill; and that although he was "wild and excited" when the occasion arrived, his shooting of the deceased was in no way caused by his excitement, or by impulse of passion, or by provocation at the time, but was done in execution of his predetermined purpose aforesaid.

There are many circumstances shown by the evidence in this case which can bear no other reasonable interpretation and which lead to no other reasonable conclusion than that just stated; not the least of which are the admissions and also the denials contained in the testimony of the accused and the wholly improbable story told by him to account for

his conduct. He admitted to Tankersley that he had done some shooting in Greenville, South Carolina and, so great was his fear of going to Greenville for trial for that shooting, he admitted to Tankersley that he preferred to be tried in Lynchburg for the offenses aforesaid which he had committed there rather than be taken to South Carolina. He denied, when on the stand as a witness, that he knew that he was wanted in Greenville or anywhere else for doing any shooting. He claims on the witness stand that he did the shooting he did on the occasion of the killing of Mann in order "to get away," "just trying to get loose," and he claims that he shot only for that purpose, that he wasn't trying especially to shoot anyone; that he was a poor shot and had never been trained to shoot with either hand; and all of this in the face of the deliberate accuracy and deadly aim of the three shots which he fired. That according to his story he had no suspicion that the men were officers or detectives or that they were trying to arrest him. He did not shoot to escape any arrest, whether lawful or unlawful, he testifies in effect though not in those words. It was a wholly different situation which confronted him, according to his account of it. So far away from a case of resisting arrest does he seek to put the case that as he tells it, it was one of an unprovoked assault upon him at the corner of 8th and Main streets of Lynchburg at about 8 o'clock in the evening of a day in March, with no purpose of robbery or any other apparent purpose, and that he did the shooting he did merely to frighten his assailants and thus enable him to get loose—to get away from them. He denies that Mann or his companions questioned him "about the gun." According to his story he had no reason to suspect that he was being arrested even for carrying a concealed weapon. He manifestly felt that he must keep the case as far away as possible from one in which he was resisting an arrest. Why? In view of the testimony in the case for the Commonwealth

91

and the admissions of the accused, the inference is irresistible that it was an arrest which he feared and which he resisted—the more legal it was the more he feared it. That hence it was that he never questioned the legality of the attempt to arrest him. That it was the fear of an arrest and deportation to South Carolina on the charges of serious crimes there which caused him to kill the deceased, Mann; that that fear had caused him to prepare for and predetermine to do such killing as aforesaid and was the sole motive therefor; and the consciousness of that guilt was ever present in the mind of the accused as is evident from his own testimony.

The learned judge of the trial court says in his opinion, "It is clear and without doubt that the prisoner's arrest was not an extenuating circumstance, but the occasion for the display of his murderous disposition, therefore he is beyond doubt guilty of murder in the first degree." Without commenting further on the facts we deem it sufficient to say in conclusion that we think the evidence fully sustains that statement.

The case will be affirmed.

*Affirmed.*