# Richmond

HENRY PANNILL v. COMMONWEALTH OF VIRGINIA.

June 10, 1946.

Record No. 3057.

Present, All the Justices.

The opinion states the case.

*P. J. Hundley* and *Maitland H. Bustard,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *V. P. Randolph, Jr., Assistant Attorney General,* for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

Henry Pannill, the accused, was indicted for the murder of his eleven-year-old daughter, tried by a jury and convicted. His punishment was fixed at death in the electric chair. The court approved the verdict of the jury and sentenced the accused to be put to death by electrocution on July 30, 1945. The judgment of the court is the subject of this writ of error.

The accused, a negro thirty-seven years of age, who resided in Pittsylvania county, had been twice married, and was the father of ten children by his first wife. His first wife divorced him and he was given the custody of his children. One child had died several years ago and another had left home, and at the time of the homicide he was caring for and supporting eight of his children on a small farm. He was illiterate, he could neither read nor write.

On April 19, 1945, his daughter, Louise, who was eleven

or twelve years of age, cut his automobile tire with an axe. This was reported to the father who was working at the barn. He called Louise to the barn, had her undress, picked up a stick and brutally beat her. This occurred before the noonday meal. The stick was identified and introduced in evidence. The defendant denied the use of this particular stick and claimed that he had switched her with a switch, but the Commonwealth's evidence amply sustains the fact that the stick which was introduced in evidence was the stick which he used. Besides the accused and the deceased there were two eye-witnesses to the whipping, one child eight years old, and another about fourteen years of age. After the whipping Louise went to the house. She stayed around the house during the afternoon and, according to the evidence of the Commonwealth, the accused, in the late afternoon, struck her again at the woodpile.

There was evidence to the effect that Louise fell out of the back door, down several large rock steps, and injured herself, but, as will be seen later, the jury evidently discredited this testimony.

Some time between eight and nine o'clock that night Louise died. She was lying on the bed at the time of her death, and she made no statement prior to her death. The evidence disclosed, as will be seen later, that she had died as a result of a fractured skull and the beating which she had received.

After her death the accused secured a casket on April 20th and buried his daughter in a grave which he had dug himself. He was the only person present at the burial.

Mrs. Owen, who is the registrar for that particular district, and whose duty it is to fill out death certificates, testified that the accused applied to her for a permit to bury his daughter; that he stated that he had no undertaker and would bury her himself. She further testified that she told him to go ahead and bury the child.

On April 25th the sheriff and his deputy, along with the coroner, began an investigation. They exhumed the body

on that date, which was six days after her death. The body had not been embalmed. This is the account of the coroner as to just what the body disclosed:

"A. Well, when the coffin was opened there was some mold on her face, and she was dressed. She had on a dress and underskirts and stockings, and under her clothes, from her knees clear up over her body, you couldn't lay your hand on her without hitting two or three marks. The marks were as large as your finger and about this long (indicating about four inches), and the skin was slick on these parts, and they were crossed. Some of them had gotten crossways where she had been hit twice, and then there were some single ones, and there were not quite as many on the front as there were on the back. There were several on her arms, and there was one on her right ear—it was terribly bruised— and there was a fracture of the skull up along in this area (indicating) that was indented. You could almost lay a lead pencil in it. It was about, I would say, an inch or inch and a half in length that you could feel under the skin, and she had been struck in the mouth also. Her lips were swollen, and after she was buried—not being embalmed— some of the bruised blood oozed out when I turned her over in the coffin and took her clothes off so I could see her.

"Q. With reference to the back of her body and all, how about those?

"A. Just those big whelps that had been kind of skinned all over her back and body. It was more, I would say, on the back than was on the front.

"Q. After your examination would you say her death was the result of those injuries you saw?

"A. Yes, sir, I felt the one in the skull and the beating was the cause of her death."

The coroner's account of the condition of the body was corroborated by the sheriff and the deputy sheriff who were present at the time the body was exhumed and examined. From the testimony of the coroner the conclusion is inescapable that the child had been brutally beaten; that her skull

had been fractured, and that she died as a result of those injuries.

The coroner further testified that the fracture of the skull could have resulted from a lick with the stick which was introduced in evidence, and he also said that the injuries he observed upon the girl's body and the injury causing the fractured skull, in his opinion, could not have resulted from a fall from the door down the stone steps.

There are no formal assignments of error, and in this respect, the petition is not in compliance with the rule of this court. However, the death sentence having been imposed, the Attorney General does not insist upon a compliance with the rule.

As previously stated, the accused claimed that his daughter fell down the stone steps, and from the fall received a fractured skull. Her brother, Sam, eight years old, testified that he saw her fall down the steps and that he and Florence carried her into the house and placed her on the bed. No one testified as to any injuries received from this fall. On the other hand, as we have indicated, the coroner testified that the bruises on her body and the fracture of the skull, in his opinion, resulted from licks struck with the stick. In fact, he measured the fracture by placing his finger in it, and said it was of the size the stick would likely make. The jury, by its verdict, has totally rejected this defense, as it had a right to do. It has accepted the testimony of the coroner, corroborated by the officers, that the child met her death as a result of the brutal beating administered by the accused in which he used the stick which was introduced in evidence.

The accused testified that he whipped his daughter for cutting the tire of his automobile with a brush which he picked up down near the barn and which had been cut while he was cutting down the brush at the barn on that morning. He also stated that he did not whip her very much; that "she ran around and around, and I didn't hit her about the head at all". He further testified that he whipped

her around the body, and that he did not hold her as he whipped her. She went to the house after he had finished. He denied that he hit her with a stick. He also denied that he later hit her again at the woodpile.

The accused testified that he purchased a casket for $30 and had a Mr. Carver, who sold him the casket, fill out the papers; he was instructed by Mr. Carver to give the papers to Dr. Owen or Mrs. Owen, and that he gave them to Mrs. Owen. Mrs. Owen, according to the accused, inquired of whom he had secured the casket, and he informed her that it had been secured from Mr. Carver. He then asked her to fix the papers, and she said "all right". Afterwards the accused returned to his home and buried the child that afternoon at two o'clock, at which time it was raining. He buried her on his own land in a field that he had set apart for a cemetery, and he placed a temporary fence around the grave.

The accused testified that he did not notify any of his neighbors because Mr. Overbey, the sheriff, had instructed him not to mingle with his neighbors for the reason he had previously had trouble with them. He further testified that he had no malice whatever against his daughter and that he never intended and didn't try to hurt her permanently. He stated that he did not have her take her clothes off at the time he whipped her. The jury evidently did not believe his testimony.

Counsel for the accused moved for a change of *venire* but his motion was denied. He claimed that the general sentiment of the county had been so inflamed by the false newspaper accounts of the homicide that the court would be unable to secure a jury in the county free from bias or prejudice and one that could give the accused a fair trial. One newspaper account related that it was alleged that the accused had beaten his daughter to death with a steel cable. There was no evidence that the accused had used a steel cable, and counsel contends that to print the account in the newspaper suggesting that the accused had used it was unfair and not true, for all of the evidence discloses that he

either used a stick or a switch. However, the court, in ruling on the motion, stated that it would examine the jurors carefully and ascertain if they could give the accused a fair trial. This, no doubt, was done, for there is no exception in the record to the qualification of any member of the *venire*.

Code, sec. 4901 (Michie), provides for a change of *venire*. If qualified jurors cannot be conveniently found in the county in which the trial is to be, the court may secure qualified jurors from another county. We have had occasion to construe this statute frequently. It is generally a matter of discretion for the trial court. *Looney* v. *Commonwealth*, 115 Va. 921, 924, 78 S. E. 625. The court may refuse to summon a jury from another county until an ineffectual effort has been made to obtain an impartial jury from the county where the trial is to take place. *Puryear* v. *Commonwealth*, 83 Va. 51, 1 S. E. 512. In *Webb* v. *Commonwealth*, 154 Va. 866, 152 S. E. 366, we held that we would not reverse the trial court on this ground unless it clearly appeared that the court abused its discretion, and in that case we further held that the fact that an impartial jury was found in the county raises a conclusive presumption that the motion for a change of *venire* was unfounded. We think the court properly overruled this motion.

Counsel made a motion for a continuance on the ground that the accused had been in jail since the offense was committed and had been unable to prepare his defense; that he had been indicted the day before the case was set for trial; and that he had been unable to interview his witnesses. He also moved for a continuance on the ground that the wife of the accused was nervous on the day of the trial and not physically able to testify. The court had her examined by a doctor and the doctor testified that while she was nervous that she was no more nervous than other witnesses who are required to testify in court.

The accused was arrested and incarcerated practically a month before the trial. A short time after he was incar-

cerated he employed counsel. The court inquired if there was any witness not present whom counsel or the accused would like to have present at the trial. They did not indicate that they desired any additional witnesses. Whereupon, the court overruled the motion for a continuance. We do not think that the court abused its discretion.

Numerous instructions were granted. The jury were instructed on murder in the first and second degrees, and voluntary manslaughter. Over objection, the court gave instruction number 4, which reads:

"The jury are instructed that a man is presumed to intend that which he does or which is the immediate or necessary consequence of his act, and if the prisoner, with a deadly weapon in his possession, without any, or upon very slight provocation, gave to the deceased a mortal wound, he, the prisoner, is *prima facie* guilty of wilful, deliberate, and premeditated killing, and the necessity rests upon him of showing the extenuating circumstances, and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State, he is guilty of murder in the first degree."

Objection was made to instruction number four on the ground that the stick introduced in evidence was not in fact a deadly weapon. The court overruled the objection, giving this reason: "The instruction number four will be given for the reason that the doctor states that the wounds found on the girl's head could have been inflicted by the stick in evidence".

██ ██ Unquestionably in Virginia malice may be inferred from the deliberate use of a deadly weapon in the absence of proof to the contrary. See Digest of Virginia and West Virginia Reports (Michie), Vol. 5, p. 383. There are deadly weapons such as a loaded pistol, a dirk, or an axe, which the court may pronounce as a matter of law a "deadly weapon". On the other hand, a weapon may not be *per se* deadly, yet the vicious and cruel use of it may be the determinative factor in pronouncing it deadly. The mere fact that death was

produced by the weapon does not establish its character as deadly.

In 40 C. J. S., Homicide, sec. 25, a deadly weapon is defined thus:

■ "A deadly weapon is one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character. The mere fact that an instrument produced death does not establish its character as a deadly weapon, although it may be evidence thereof. Among other instruments which may under the circumstances of their use be regarded as deadly weapons may be enumerated sticks and cudgels of various description, a blackjack, metal bars and rods, metallic knucks, rocks, bricks, beer glasses, knives, scissors, a hoe, an ax, a sledge hammer, a chisel, a steel screw driver, a blacksmith's tongs, a fence rail, a hunting rifle, a pistol or revolver used either for shooting or striking, and a shotgun used as a club. A blow with the fist does not ordinarily imply malice, although there may be an inference of malice, where such an attack has been made on an infant of tender years or on a person enfeebled by old age or worn out by disease."

See also, 26 Am. Jur., Homicide, secs. 7 and 8; Annotation 30 A. L. R., p. 816, and Words and Phrases, Third Series, Vol. 2, p. 805.

■ ■ Generally, unless a weapon is *per se* a deadly one, the jury should determine whether it, and the manner of its use, places it in that category, and the burden of showing these things is upon the Commonwealth. Under the peculiar facts of this case, and after a careful examination of the stick used, which is before us as an exhibit, it seems clear that the stick here is not, as a matter of law, a deadly or dangerous weapon. It is thirty-six inches long, approximately one-half inch in diameter, and weighs three and three-fourths ounces. It is a seasoned branch, and seems to be midway between what might be termed a switch and a stick. From its appearance it could not be said as a matter

of law that it would produce death or great bodily injury. No other weapon of any kind was connected with the killing in this case. We think that the jury should have been instructed on this point because, as applied to the peculiar facts here, the phrase, "with a deadly weapon in his possession", used in instruction number four is not self-explanatory but rather misleading. For these reasons we are of the opinion that instruction number four was not correct or applicable.

Murder in Virginia is defined by statute, Code, sec. 4393 (Michie). It is needless to quote it. It is essential in cases of this class that it be a wilful, deliberate, and premeditated killing before it can be murder in the first degree. There must be a specific intent to kill in order to constitute murder in the first degree. *Fields* v. *Commonwealth*, 129 Va. 774, 106 S. E. 333, and *Williams* v. *Commonwealth*, 128 Va. 698, 104 S. E. 853.

In the *Williams Case, supra,* the court quoted from *McDaniel* v. *Commonwealth*, 77 Va. 281, at page 284:

" 'Now to constitute a "wilful, deliberate and premeditated killing," it is necessary that the killing should have been done on purpose, and not by accident, or without design; that the accused must have reflected with a view to determine whether he would kill or not, and that he must have determined to kill as the result of that reflection, before he does the act—that is to say, the killing must be a predetermined killing upon consideration, \* \* \* and that the design to kill need not have existed for any particular length of time, it may be formed at the moment of the commission of the act, \* \* \* ' ".

The difference between murder in the first and second degree depends upon the intent of the accused at the time of the killing. Every malicious homicide is murder. If in addition the killing be wilful, deliberate, and premeditated, it is murder in the first degree. *Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382.

According to the evidence in this case the accused had no hatred or prior ill will towards his daughter.

There is no evidence that he had ever before mistreated her or that he had made any prior threats against her. We are unable to conclude from this record that he really intended to kill her, and this intent being lacking, there could be no murder in the first degree. In Virginia every unlawful homicide is presumed in law to be murder in the second degree. That is to say, it is presumed to have been done with malice. To elevate the offense to murder in the first degree is a burden placed upon the Commonwealth. To lower the offense to manslaughter is a burden placed upon the accused. *Bradshaw v. Commonwealth*, 174 Va. 391, 4 S. E. (2d) 752. The jury were not instructed on this point. No such instruction was requested by the accused. But he having been found guilty of murder in the first degree and sentenced to the electric chair, we think an exception to rule 22 should be indulged in order to attain the ends of justice, and that even though no request for such an instruction were made the court should have instructed the jury on this principle.

In *Maxwell v. Commonwealth*, 167 Va. 490, 187 S. E. 506, the daughter killed her father by beating him on the head with the heel of a slipper, and we held that this was not a wilful, deliberate and premeditated killing, and therefore it was not murder in the first degree. We further held that on the evidence in the record in that case the jury might have found the accused guilty of murder in the second degree but of no higher offense. (Upon the second trial she was found guilty of murder in the second degree and we affirmed. See *Maxwell v. Commonwealth*, 169 Va. 886, 193 S. E. 507.) What we said there is strikingly applicable here. We do not think that the accused here has been shown to have been guilty of murder in the first degree. He might have been found guilty of murder in the second degree.

We therefore reverse the judgment of the trial court for the error in granting instruction number four; for its failure to give an instruction embodying the principle that every

unlawful homicide is presumed to be murder in the second degree; and also for the reason that in our opinion the record in this case does not sustain a conviction of murder in the first degree.

*Reversed and remanded.*

SPRATLEY, J., dissenting.

A jury has found that an eleven-year-old, helpless child has come to her death by a cruel, vicious beating administered to her by her father in a heartless display of anger and rage. An able and learned trial judge has approved the verdict. On review by this court, the life of the accused is at stake. It is a grave matter to say that his life should be forfeited. It would be far easier to agree that death is too severe a punishment for his offense and grant him another trial; but the administration of law and the welfare of society is involved. We must solemnly determine whether or not the accused has had a fair and just trial, according to the law and the evidence.

The appalling nature of the accused's offense and its tragic results are fairly set out in the majority opinion.

Based on the evidence, eleven instructions were given to the jury. They related to murder in the first and second degrees, voluntary manslaughter, and simple assault. Of course, they must be read and considered in connection with each other.

Instruction number 4 is a standard or stock instruction, which states the law in Virginia as it has been established for more than a century. It is a statement of general principles to be applied to facts ascertained by the jury. Nowhere does it state that the weapon used by the accused was a deadly weapon, as a matter of law. It says that: "If the prisoner, with a deadly weapon in his possession, without any or upon very slight provocation gave to the deceased a mortal wound, he, the prisoner, is *prima facie* guilty of wilful, deliberate and premeditated killing, * * * ."

The word "If" presented the question of fact. It qualified the application of the principle stated to the employment of a deadly weapon as the instrument of death.

The statement of the principle was justified by the evidence of Dr. H. H. Hammer, the coroner, a physician who testified that the fracture of the child's skull could have resulted from a lick with the stick introduced in evidence, and that the fracture and the beating she received were the cause of her death. Neither the personal character nor the professional ability of Dr. Hammer was attacked. His evidence was uncontradicted. In fact, his report as to the nature of the extent of the child's injuries was fully corroborated.

The accused claimed that he did not use the stick exhibited in evidence. The jury evidently did not believe him. They believed that he did use it, that it was capable of being used and was used to inflict the fatal injuries.

The instruction was further justified by the vicious, cruel and inhuman attack, the result of which demonstrated the deadly capacity of the stick.

Instruction number 9 also presents the issue of fact whether the stick used by the accused was a deadly weapon. This instruction reads, in part, as follows:

"The Court instructs the jury that they should find the defendant, Henry Pannill, not guilty if they believe from the evidence that he struck the deceased, Louise Pannill, with an ordinary switch or branch of a tree without intent to kill her or to do her great bodily harm, or if they believe the deceased came to her death from an attack of apoplexy or spasms, and that the fracture of the skull was the result of falling on the rock step, or from any other cause than the licks inflicted by the defendant."

No one contends that the stick involved is a deadly weapon as a matter of law, any more than an ordinary walking stick or an ice pick. As Mr. Justice Gregory says: "It is the manner of its use which determines its capacity as a deadly weapon." Our statute, Virginia Code, 1942, (Michie), sec-

tion 4393, does not confine murder to a killing with a deadly weapon. Any wilful, deliberate, and premeditated killing is murder, however, regardless of the nature of the weapon or means used to cause death.

I know of no rule or reason which justifies us to reject arbitrarily both the evidence of the physician, one peculiarly qualified to determine the extent of injuries which might be inflicted by the stick, and the conclusion of the members of the jury, as competent as are the members of this court to evaluate the capacity of the stick and the result of its use, and say that, having seen the stick, we do not believe that it could have been used to produce death or great bodily injury.

There were no extenuating circumstances for the horrible crime of the accused. He secured a stick, called the child from the house to the barnyard, stripped her of her clothes, and, while she cried in terror and ran around and around, beat her until she collapsed. The result of his attack was apparent to him. He had ample time for reflection and meditation. The time and opportunity for deliberation, the terrible wounds and bruises on the body of the child from her knees to the top of her head, on her throat and face, and the blow on the side of her head, all afford tragic evidence which proclaims aloud an act of premeditation and malice. The nature of his act and its immediate and necessary consequences furnish the presumption that he was either indifferent to the fate of the child, or wilfully, and deliberately intended to kill her.

Of course, we ought not to require such a strict performance of Rule of Court XXII as to cause injustice. It is far more important that a man should have a fair trial than that mere rules of procedure, however necessary in the administration of justice, should be strictly observed; but no man is entitled to more than one fair trial.

I cannot subscribe to the view that a single circumstance in the facts or in the pleadings warrant any exception to Rule XXII.

The accused was represented in the trial court and in this court by able and experienced counsel of his own choosing. The record shows that he has been forcefully and capably represented.

From the record, it seems apparent that counsel for the accused realized that if the jury believed Pannill beat his child with the stick in evidence, in the manner related, it had the right to consider whether the stick became a deadly weapon as a matter of fact through the use made of it. That was, in truth and in reality, the principal issue before the jury. The accused asked for no instruction describing or defining a deadly weapon. In this court no point was made of his failure so to do. Such an instruction would have merely defined a deadly weapon. The evidence supplied the essential requirements of the definition. An instruction pointing out this feature of the case could not have been helpful to the accused.

In my opinion, the record amply sustains a conviction of murder in the first degree,—premeditated, malicious, cold, brutal, and cowardly. Rarely does a more brutal murder come before us. Under the circumstances, this court should not be alert to discover a loophole through which the accused can escape merited punishment. As I see it, the opinion of the majority does violence to long established rules of law.

CAMPBELL, C. J., and HOLT, J., concurring in dissent.