455 S.E.2d 253

**Dennis Joseph BERRY**

v.

**COMMONWEALTH of Virginia.**

**Record No. 1958–93–2.**

Court of Appeals of Virginia,
Richmond.

March 21, 1995.

Angela D. Whitley, Richmond, for appellant.

Thomas C. Daniel, Asst. Atty. Gen. (James S. Gilmore, III, Atty. Gen., on brief), for appellee.

Present: BENTON, J., and COLE and HODGES, Senior Judges.

## OPINION

BENTON, Judge.

Dennis Joseph Berry contends on this appeal that the trial judge erred in permitting the prosecutor to cross-examine a defense witness on a subject that was beyond the scope of the direct examination. Because we conclude that the questioning was within the scope of the witness's direct testimony, we hold that the trial judge did not err, and we affirm the conviction.

## I.

Berry was indicted for aggravated sexual battery, rape, and breaking and entering, while armed, with the intent to commit rape. At trial, the Commonwealth's evidence proved that the victim received a series of obscene phone calls beginning in the spring of 1992. During the calls, the caller asked her "why [she] wore clothes to show up [her] breasts in public?" Usually, the calls were received on Fridays at 6 a.m. When the victim received a similar call on October 27, 1992, she wrote the time and originating number as shown on an identification device attached to her telephone. Using this information, the police located the telephone from which the call was made and obtained a videotape from a surveillance camera that recorded persons using that telephone. The videotape showed Berry using the telephone at the approximate time the October 27 call originated. The evidence proved that another call originated from a telephone in a fabric shop the same day Berry visited the shop and used the telephone.

**34**

The evidence further proved that on the morning of September 18, 1992, at 6 a.m., the victim responded to a knock at her door. A man with a knife in his hand pushed her into her house and sexually assaulted her. She testified that the man said, "why do [you] like to show up [your] body in public, talking about . . . breasts." From a photographic spread and in court, the victim identified Berry as the man who entered her home and assaulted her. The victim also listened to several voice samples and recognized a voice, that of Berry, as being the same as the person who made the obscene calls.

Berry's wife testified as a defense witness. On direct examination, Berry's trial counsel asked her several questions concerning the family's morning "routine." She testified that she and Berry arose every morning at 6:30 a.m. She stated that their alarm clock was set for 6:00 a.m.; however, she said that they remained in bed until 6:30 a.m. She also testified that she was a light sleeper and would have known if Berry arose before 6:30 a.m.

During cross-examination, the prosecutor asked whether she told a friend that her husband admitted making obscene phone calls to the victim. Berry's counsel objected on the ground that the question was beyond the scope of the direct examination and stated that the direct examination concerned only the events of September 18. The trial judge overruled the objection.

Berry's wife then testified on cross-examination as follows:
Q  Mrs. Berry, my question would be, do you recall having a conversation with Bob Scott in which you told him that your husband admitted making the phone calls to Ms. Clements to you, and that the gist of the conversation was that you were concerned about your status of your relationship you were having with your husband because you knew he made those phone calls to Ms. Clements. Do you recall having that conversation with Bob Scott?
A  I don't recall, no, but—
Q  Could you have had that conversation?
A  Yes.

Q Your husband admitted making the phone calls to you?

A Yes.

\* \* \* \* \* \*

Q That being the case, Ms. Berry, if I indicated to you that the evidence showed that some of these phone calls that he admitted making to you were at 6 o'clock in the morning, how can you tell this jury that his common practice was to sleep in, in the morning, and that he was always at home?

A I don't think he made any phone calls at 6 o'clock in the morning.

Q Is there any reason why you would have told Mr. Scott that?

A I didn't tell Mr. Scott that they were at 6 o'clock in the morning.

On redirect examination, Berry's counsel elicited from her testimony that Berry did not get out of bed in sufficient time to make a telephone call at 6 a.m. She testified that she would have known if he had done so.

## II.

"[A] witness may be cross-examined upon any testimony given by him [or her] in chief." *Williams v. Commonwealth,* 128 Va. 698, 713, 104 S.E. 853, 858 (1920). *Accord Fisher v. Commonwealth,* 16 Va.App. 447, 455, 431 S.E.2d 886, 891 (1993). If the question is "relevant to the facts testified to" by the witness on direct examination or if the question tends "to test the veracity or credibility of the witness," the question is proper. *Williams,* 128 Va. at 714, 104 S.E. at 858.

Contrary to Berry's assertion that the witness's direct testimony was confined to the events of a specific date only, the record reflects that the questions posed to the witness on direct examination sought testimony concerning generalized conduct. For example, the witness testified as follows on direct examination:

Q What time do you go to work every day?

A  I have to be there at 8:30, I leave my home normally around 7:30.

Q  When you say normally, is that the normal routine?

A  Yes, yes.

Q  And does that include the routine that [Berry] has also?

A  Yes. Since I worked so far away, our normal routine was to get up together around 6:30, and I would go on and prepare myself to go to work and he would feed, dress and take care of the children so that I wouldn't have to waste any time to drive across town.

Q  So you get up approximately 6:30 every morning?

A  Yes.

Q  Do you have your alarm clock set for that time?

A  Actually, it's set for around 6:00, and then snoozes for about half an hour.

Q  Did you notice anything unusual in September that occurred?

A  No.

Q  So your routine would have been followed every day?

A  Yes.

This testimony was offered to prove that Berry did not arise before 6:30 a.m. and that the witness had direct knowledge of Berry's conduct. The trier of fact could have inferred from this testimony, if believed, that Berry could not have been the person who telephoned the victim prior to the assault. The cross-examination was designed to test both the witness's basis to know whether Berry had, on occasions, arisen in time to make telephone calls and the witness's veracity and credibility when she testified that Berry never arose before 6:30 a.m.

Because the cross-examination related to a material matter placed in issue by the witness's direct testimony and because the questioning had the tendency to impeach the veracity of the witness, the trial judge did not err in permitting the inquiry. *See Hummel v. Commonwealth,* 217 Va. 548, 550, 231 S.E.2d 216, 217 (1977) ("While it is true that the trial

[judge] may, in the exercise of discretion, limit cross-examination of a witness within reasonable bounds, that does not mean that in the exercise of such judicial discretion [the trial judge] should exclude relevant evidence which tends to attack the credibility of a witness who is not a defendant").

*Affirmed.*