469 S.E.2d 90

**Thomas Payne BROWN, Jr.**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0926-94-2.**

Court of Appeals of Virginia,
Richmond.

April 23, 1996.

Annunziata, J., filed dissenting opinion.

318

Steven D. Benjamin, Richmond (Betty Lane DesPortes; Steven D. Benjamin and Associates, on briefs), for appellant.

Eugene Murphy, Assistant Attorney General (James S. Gilmore, III, Attorney General; Donald R. Curry, Senior Assistant Attorney General, on brief), for appellee.

Present: BENTON, ELDER and ANNUNZIATA, JJ.

BENTON, Judge.

Thomas Payne Brown, Jr.'s first trial for murder ended in a mistrial after the jury failed to reach a verdict. In his second trial, Brown was convicted of first degree murder. The Supreme Court reversed the conviction because the trial judge did not allow Brown to cross-examine the Commonwealth's chief witness, Daniel Sydow, regarding offers of leniency made by the Commonwealth and also because the trial judge refused to allow Brown's counsel to proffer the barred testimony. *Brown v. Commonwealth*, 246 Va. 460, 437 S.E.2d 563 (1993). When Brown was tried a third time, he was convicted by a jury of second degree murder. On this appeal, Brown contends that the trial judge erred in prohibiting him from introducing evidence in his defense to rebut Sydow's testimony and erred in admitting hearsay evidence. For the reasons that follow, we reverse the conviction and remand for a new trial.

## I.

The evidence proved that Wayne Peyton was found dead in a utility room at his residence between 3:30 and 4:30 p.m. on March 21, 1991. Peyton's skull had been crushed. Inside the utility room, the police found a broken watch. In Peyton's bedroom, the police found cocaine, scales, several thousand dollars in cash, and a small handgun. Peyton's cellular telephone was missing.

Two months after Peyton's death, a police officer interviewed Brown. Brown told the police that Peyton was a drug dealer who supplied him with cocaine. Brown said that in the early morning of March 21, he went to Peyton's house, bought cocaine, and remained with Peyton twenty minutes before leaving. Brown identified the watch found in the utility room as his; he said the watch often fell off because the band was broken. He denied killing Peyton. Brown was arrested for the killing.

## II.

Brown contends that the trial judge improperly limited his efforts to elicit testimony from his witnesses rebutting testimony given by the prosecution's chief witness, Daniel Sydow. He first challenges the trial judge's ruling sustaining the prosecutor's objection to the testimony of Dr. Miller Ryans.

On direct examination as a witness for the Commonwealth, Sydow testified that he and Brown were cellmates in jail after Brown was arrested for Peyton's murder. Sydow testified that Brown told him that he had a disagreement with Peyton over a drug debt and that he killed Peyton with a cellular phone. When asked on direct examination why he chose to tell authorities of his conversations with Brown, Sydow testified that "after he told me what he was in for I pretty much stayed away from him. I'm not a violent—I'm not into violence at all." In response to the prosecutor's questioning, Sydow said that none of his thirty felony convictions were for crimes of violence.

Sydow also testified on direct examination as follows:

Q   Sir, you have a disorder; is that correct?

A   Yes.

Q   Tell the jury what that disorder is?

A   I'm a bipolar disorder. I'm a manic depressant.

Q   And if you are taking the prescribed medication you're as normal as everyone else?

A   Correct. It's a chemical disorder. It's not a psychological or medical disorder, it's organic.

Q   And that doesn't inhibits your ability from remembering things and telling the truth does it?

A   No.

On cross-examination, Sydow admitted reporting to prison authorities in 1991 that he was hearing voices. He said he heard voices when he stopped taking medication. When asked whether he had ever said that he has been diagnosed with an antisocial personality, Sydow responded, "I guess that's a trait of being a manic depressive, yes." When asked whether he

had been recently diagnosed by Dr. Ryans as having an antisocial personality, he responded, "No, I think the diagnosis was bipolar personality disorders." In discussing his disorder, he testified that he has "never wanted to hurt anybody." However, he admitted that on a personality test he responded "True" to the question: "Sometimes I feel like I must do something to hurt myself or someone else." He denied saying that he heard demons urging him to harm others. Sydow admitted to having lied in the past in order "to get out of trouble."

During the defense case, Brown's counsel called as a witness Dr. Miller Ryans, a forensic psychiatrist employed by the Commonwealth. When the Commonwealth objected, the trial judge required Brown's counsel to proffer Dr. Ryans' testimony out of the presence of the jury. Brown's counsel asserted that Dr. Ryans would contradict Sydow's testimony that he had not been committed to the mental hospital and Sydow's testimony concerning his mental condition. Dr. Ryans then stated that he was chief of forensic services at Central State Hospital where Sydow was admitted in 1993 complaining of hearing demons. Dr. Ryans stated that Sydow reported that the demons were telling him to harm himself and others. Dr. Ryans diagnosed Sydow's condition as an antisocial personality disorder. He said that one of the symptoms of Sydow's condition was a tendency to have no regard for the truth, as indicated by repeated lying. He said that Sydow exhibited that symptom when he was at the hospital.

The trial judge ruled that Dr. Ryans could only testify concerning Sydow hearing demons. In the jury's presence, Dr. Ryans testified that Sydow was admitted to Central State Hospital and claimed that demons were telling him to harm himself and others.

### III.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitu-

tion guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (citations omitted). *See also* Va. Const. art. I, § 8. Applying these principles, we have held that "a defendant cannot be deprived of the opportunity to put his evidence and version of the facts before the jury so 'as to deprive a criminal defendant of his Sixth Amendment right to confront and cross-examine his accuser and to call witnesses in his defense,' or simply because the trial court finds the prosecutrix's version more credible than the defendant." *League v. Commonwealth*, 9 Va.App. 199, 205, 385 S.E.2d 232, 236 (1989) (citation omitted). The opportunity to present a complete defense "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on ... credibility ... when such evidence is central to the defendant's claim of innocence." *Crane*, 476 U.S. at 690, 106 S.Ct. at 2147. "Combined, the rights to compulsory process, confrontation and due process give the defendant a constitutional right to present relevant evidence." *Neeley v. Commonwealth*, 17 Va.App. 349, 356, 437 S.E.2d 721, 725 (1993).

On direct examination in its case-in-chief, the Commonwealth proved by Sydow's own testimony that Sydow had an illness that was a "chemical disorder" and that Sydow's illness "doesn't inhibit [his] ability from remembering things and telling the truth." The Commonwealth proved these matters as a means of enhancing Sydow's credibility with the jury. Indeed, when the Commonwealth offered Sydow as its witness, it "vouch[ed] for his credibility." *Hall v. Commonwealth*, 178 Va. 22, 26, 16 S.E.2d 304, 305 (1941).

The defense was entitled to attack Sydow's credibility. *Deavers v. Commonwealth*, 220 Va. 14, 16, 255 S.E.2d 458, 459 (1979); *Hummel v. Commonwealth*, 217 Va. 548, 550, 231 S.E.2d 216, 217 (1977). Because the jury determines the credibility of witnesses, *Zirkle v. Commonwealth*, 189 Va. 862, 870, 55 S.E.2d 24, 29 (1949), Brown's counsel was entitled to offer impeaching evidence that had the tendency to cause the

jury to reject Sydow's testimony. *Id.* Relevant evidence that tends to impeach a witness' credibility and assists in an accused's defense is admissible. *Hummel,* 217 Va. at 550, 231 S.E.2d at 217.

■ The Commonwealth sought to minimize the effect of Sydow's illness and explicitly drew from Sydow testimony that his illness did not affect his ability to remember and tell the truth. Because this evidence was elicited on direct examination, the inquiry was opened for impeachment. *Santmier v. Commonwealth,* 217 Va. 318, 319–20, 228 S.E.2d 681, 682 (1976). Sydow's denials were intended to "create an impression in his favor, which the [defense] was justified in rebutting." *Locke v. Commonwealth,* 149 Va. 447, 452, 141 S.E. 118, 120 (1928).

■ The record established that Dr. Ryans had examined Sydow and diagnosed his illness. The proffered testimony established that Dr. Ryans was prepared to directly contradict Sydow's testimony concerning the nature of his illness and the general manifestations of that illness. Unlike the circumstances in *Coppola v. Commonwealth,* 220 Va. 243, 252, 257 S.E.2d 797, 803–04 (1979), *cert. denied,* 444 U.S. 1103, 100 S.Ct. 1069, 62 L.Ed.2d 788 (1980), Brown's counsel did not seek to have Dr. Ryans testify that Sydow could not be believed. Rather, the testimony was offered to establish that Sydow had not been truthful about his illness and that one manifestation of Sydow's illness was a lack of regard for the truth. The Supreme Court has held that a witness' mental impairment which affects the witness' ability to relate matters at issue may be proved to discredit the witness' testimony. *See Mastin v. Theirjung,* 238 Va. 434, 440–41, 384 S.E.2d 86, 89–90 (1989). Dr. Ryans' testimony bore directly upon Sydow's credibility because it impeached Sydow's testimony given on direct examination. Thus, we hold that the trial judge improperly limited the scope of his testimony. The error was not harmless because Dr. Ryans' testimony, if believed by the jury, would have provided a basis for the jury to reject Sydow's testimony.

## IV.

Because this case must be remanded for another trial, we address Brown's contentions that the trial judge erred in barring testimony of Deputy Sheriff Kenneth Maines and in admitting hearsay testimony.

## A.

During the Commonwealth's case-in-chief, Sydow testified on direct examination that he was not a violent man, had not been convicted of a crime of violence, and that his thirty convictions were for crimes against property. The trial judge *sua sponte* barred defense counsel from cross-examining Sydow concerning his acts of violence and stated "you can bring the individuals in and let [them] testify."

During the defense case, Brown's counsel sought to elicit testimony from Deputy Kenny Maines about Sydow's violent conduct during a civil trial on March 28, 1994. Upon objection by the Commonwealth, Brown's counsel stated that during the prosecutor's direct examination of Sydow, the prosecutor elicited testimony that Sydow was not a violent person and did not engage in violent behavior. The trial judge allowed defense counsel to proffer Maines' testimony out of the jury's presence.

Maines stated that at the conclusion of a civil case in which Sydow was a litigant, Sydow used "very obscene vulgar language," several times threatened to kill the other litigant, made gestures toward the judge, and "got in the Judge's face." Because of his violent conduct, the deputy put him in handcuffs. Sydow was charged with obstruction of justice, contempt of court, and assault and battery.

Ruling that Maines' testimony did not show that Sydow had been convicted and did not tend to prove Sydow was not credible, the trial judge disallowed Maines' testimony. Although we agree that the trial judge could require Brown to focus his proof upon evidence that tended to impeach Sydow, we do not agree that Maines' testimony could be barred in its

entirety. The Commonwealth elicited testimony from Sydow on direct examination that he was not a violent person in an apparent attempt to prove his motive for testifying and to compensate for the fact that Sydow had been convicted of numerous felonies. That testimony could only have been intended to bolster Sydow's credibility.

However, when a witness' "answer to the question propounded on direct examination ... was calculated to mislead the jury ... [and] was untrue," the witness "opened the door to cross-examination for the purpose of attacking his credibility." *Santmier*, 217 Va. at 319–20, 228 S.E.2d at 682.

> "[A] witness may be cross-examined upon any testimony given by him [or her] in chief." If the question is "relevant to the facts testified to" by the witness on direct examination or if the question tends "to test the veracity or credibility of the witness," the question is proper.

*Berry v. Commonwealth*, 20 Va.App. 32, 35, 455 S.E.2d 253, 255 (1995) (citations omitted). *See also Basham v. Terry*, 199 Va. 817, 824, 102 S.E.2d 285, 290 (1958). Moreover, to the extent that Maines' testimony proved acts of violence, it rebutted Sydow's testimony and was admissible as impeaching evidence.

The Commonwealth argues that because the jury chose to believe Sydow despite abundant impeachment, this "marginal impeachment ... would [not] have made any substantial difference." We need not decide the question of harmless error because the appeal is reversed on other grounds.

### B.

At trial, Brenda Pleasants testified for the Commonwealth that Peyton, the victim, telephoned her at 2:00 a.m. on March 21, 1991, and asked her to call him at 7:00 a.m. When she began to detail her conversation with Peyton, Brown's counsel objected that her testimony was hearsay. The trial judge ruled that it was covered by an exception to the hearsay rule. Pleasants then testified that Peyton telephoned and asked her to wake him before she left for work at 7:00 a.m. She testified

that Peyton said Brown was "coming to his home, something about furniture." She called Peyton again at 8:20 that morning to ensure he was awake. The trial judge told the jury that "the only reason that testimony is admissible [is] to show why she called him."

Peyton's brother also testified that he had a phone conversation with Peyton on March 21 at 9:00 or 9:30 a.m. The trial judge overruled counsel's hearsay objection. Peyton's brother further testified that he spoke to Peyton that morning about going to Brown's house to get furniture. He spoke to his brother a second time that morning while Peyton was waiting for a phone call from Brown. When he returned home after noon, Peyton had left a message on his answering machine.

The following principles are well settled:

> The hearsay rule excludes out-of-court declarations only when they are "offered for a special purpose, namely, as assertions to evidence the truth of the matter asserted." If the court can determine, from the context and from the other evidence in the case, that the evidence is offered for a different purpose, the hearsay rule is no barrier to its admission.

*Manetta v. Commonwealth,* 231 Va. 123, 127, 340 S.E.2d 828, 830 (1986) (citations and emphasis omitted). " '[The proponent] ... seeking to have hearsay declarations of a witness admitted as an exception to the general rule must clearly show that they are within the exception.' " *Doe v. Thomas,* 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984) (citation omitted).

The Commonwealth asserts that Pleasants' testimony relating Peyton's statements to her on the telephone was admissible to prove that she called Peyton at his request. Even if we assume that Peyton's request that his sister call him at 7:00 a.m. was "offered solely to show that it was uttered, without regard to the truth or falsity of its content," *Speller v. Commonwealth,* 2 Va.App. 437, 446, 345 S.E.2d 542, 548 (1986) (emphasis omitted), her further testimony, that Peyton made the request "because he had—Thomas Brown was coming to his home, something about furniture," does not

fall within that same category. That assertion was offered for its truth. No other reason is manifest from the record.

■ Likewise, the record does not adequately support the admission of Peyton's brother's testimony that Peyton told him on the telephone that Peyton was "waiting on a phone call from [Brown] so he could go pickup the piece so he could bring it to the house." The Commonwealth's assertion that this evidence is not hearsay because it was offered to prove only that Peyton was alive is not persuasive. The content of the conversation was not necessary to prove Peyton was alive. The content of the telephone call established that Peyton was waiting for a telephone call. That Peyton talked by telephone would have been sufficient to prove Peyton was alive. The substance of the call was necessary only to prove the truth of the assertions that Peyton made in the conversation.

We also need not reach the question of harmless error on this issue because we reverse and remand for a new trial for the trial judge's failure to allow impeachment testimony by Dr. Ryans.

*Reversed and remanded.*

ANNUNZIATA, Judge, dissenting.

I respectfully dissent from the majority opinion and would affirm the conviction. In my judgment, the trial judge correctly ruled that Dr. Ryans' testimony was inadmissible. The doctor's testimony improperly expressed an opinion regarding a witness' credibility.

> The credibility of witnesses is a matter for the jury to decide, weighing such factors as the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and observing the things about which they testify, their interest in the outcome of the case, their bias, and if any had been shown, their prior inconsistent statements and prior criminal convictions.

*Mullis v. Commonwealth,* 3 Va.App. 564, 571, 351 S.E.2d 919, 923 (1987).

The Virginia Supreme Court has ruled that an expert may not "express an opinion as to the veracity of any witness." *Fitzgerald v. Commonwealth*, 223 Va. 615, 630, 292 S.E.2d 798, 806 (1982). While expert testimony may be admitted to establish the existence and characteristics of a mental or personality disorder which could affect a witness' credibility, such evidence is inadmissible where the thrust and intent of the evidence is that a witness' testimony "[can] not be believed" because of his personality disorder. *Coppola v. Commonwealth*, 220 Va. 243, 252–53, 257 S.E.2d 797, 804 (1979), *cert. denied*, 444 U.S. 1103, 100 S.Ct. 1069, 62 L.Ed.2d 788 (1980); *see also Davison v. Commonwealth*, 18 Va.App. 496, 503–04, 445 S.E.2d 683, 687–88 (1994) (expert evidence improperly admitted where designed to bolster a specific witness' credibility).

The majority only partially addresses the proffered testimony excluded by the trial court. The majority states that Dr. Ryans' testimony was offered to establish "[1] that Sydow had not been truthful about his illness and [2] that one manifestation of Sydow's illness was a lack of regard for the truth." Had the inquiry been limited to these two issues, Dr. Ryans' testimony would have been admissible, at least with respect to the latter issue.[1] Whether Sydow had been diagnosed by Dr. Ryans as having an antisocial personality disorder and whether *an antisocial personality disorder* is characterized by, *inter alia*, the lack of regard for the truth, are matters upon which an expert may express an opinion under the holding in *Coppola*.

However, the record shows that Dr. Ryans' proffered testimony included his opinion concerning *Sydow's* ability to tell

---

1. Whether Dr. Ryans' testimony would be admissible to show that Sydow had not been truthful about his illness is more problematic. While Sydow denied on direct that his disorder did not inhibit his ability to tell the truth, on cross-examination, in response to defense counsel's question, he stated *he did not understand* that "part of the diagnosis ... for antisocial personalities [is that] someone has no regard for the truth as indicates [sic] by personal lying...."

the truth. Dr. Ryans' proffered testimony, in answer to defense counsel's questions, was as follows:

Q Did you make a diagnosis at the end of [Sydow's] stay at Central State?

A Yes.

Q Did that diagnosis include ... that he exhibited symptoms of antisocial personality disorder?

A Yes.

Q Are there certain specific diagnostic criteria for that diagnosis?

A Yes.

Q One of the criteria that *Sydow exhibited* was that number six under criteria?

A Yeah, six.

Q Would that be has no regard for the truth as indicated.... Number six would be—would that be no regard for the truth as indicates [sic] by repeat [sic] lying, *was that a criteria exhibited by Sydow?*

A Yes.

Q Did he also exhibit criteria number 10?

A Yes.

Q And that would be lacks remorse, feels justified in having hurt, mistreated or stolen from others?

A Yes.

The trial court correctly concluded that the thrust of Dr. Ryans' proffered answer was not limited to describing the characteristics of the personality disorder suffered by Sydow; rather, the inquiry sought to elicit an opinion that Sydow had no regard for the truth and that he repeatedly lied. As such, the evidence was properly excluded under *Coppola* and its progeny.[2]

---

2. The majority cites *Mastin v. Theirjung,* 238 Va. 434, 384 S.E.2d 86 (1989), as authority for the conclusion that Dr. Ryans should have been permitted to testify that Sydow exhibited a lack of regard for the truth. *Mastin* does not stand for the proposition cited. The issue in *Mastin*

Even assuming Dr. Ryans' testimony should have been admitted, the trial court's error was harmless in light of the abundant evidence relating to Sydow's credibility. *See Townes v. Commonwealth,* 234 Va. 307, 325 n. 6, 362 S.E.2d 650, 660 n. 6 (1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1249, 99 L.Ed.2d 447 (1988). Sydow admitted to thirty prior felony convictions, to using numerous aliases, and to having lied in the past in order "to get out of trouble." Furthermore, as set forth below, the evidence of appellant's guilt established by the testimony of witnesses other than Sydow, including the testimony of the criminal investigators and that of appellant himself, is more than sufficient to sustain his conviction beyond a reasonable doubt.

Because I agree with the trial court's ruling regarding Dr. Ryans' testimony, I will address appellant's remaining grounds for appeal. Appellant contends that he sought to impeach Sydow's testimony that he was not a violent person by introducing Maines' testimony of Sydow's prior inconsistent conduct. As pointed out by the majority opinion, such testimony regarding Sydow's prior inconsistent conduct was admissible as impeaching evidence and was improperly excluded. However, its exclusion was harmless error. Evidence of Sydow's prior "violent" conduct was in fact admitted on cross-examination when appellant was permitted, without objection from the Commonwealth, to elicit the testimony that charges were pending against Sydow for "assault and bodily harm." Appellant was precluded from eliciting from Maines, testimo-

---

was whether the plaintiff's post-traumatic stress syndrome was affected by her alcoholism. According to plaintiff's physician, the plaintiff told him that her alcoholism had been in remission for two years. Relying on plaintiff's statement, the physician testified that, because she was in remission, plaintiff's syndrome was unaffected by her alcoholism. However, the doctor's records indicated plaintiff had been drinking recently, and evidence of plaintiff's continued alcohol use was found properly admitted to impeach the doctor's testimony, as well as the plaintiff's credibility. *Id.* at 440–41, 384 S.E.2d at 89–90. It is important to note that no attempt was made in *Mastin* to elicit expert opinion testimony concerning a particular witness' ability to tell the truth and the opinion in no way suggests that the case expands or reverses the holding in *Coppola.*

ny that, in the case that resulted in the assault charge, Sydow threatened to kill the other litigant, used "obscene vulgar language," gestured toward the judge, and got "in the judge's face." In light of the evidence that Sydow was charged with assault and bodily harm, the trial court's exclusion of the details of Sydow's conduct, if error, was harmless.[3]

Finally, while I agree with the majority that the statements elicited from Pleasants and Waddy were hearsay and improperly admitted, their admission was harmless error. *Schindel v. Commonwealth*, 219 Va. 814, 817, 252 S.E.2d 302, 304 (1979) ("Even though testimony is objectionable as hearsay, its admission is harmless error when the content of the extrajudicial declaration is clearly established by other evidence"). The evidence established that Peyton was killed sometime between 8:30 a.m. and approximately noon. The evidence also established that the appellant and the decedent had argued four days before the murder over a drug debt Peyton owed the appellant. The cause of Peyton's death was "acute head injuries." According to the medical examiner, some of the head wounds were "patterned" or "repetitive" in their shape, indicating that the murder weapon had a "rounded" edge. The decedent's cellular phone was missing from his house when his body was found.

The decedent's neighbor testified that on the day of the murder, he saw a small white pickup truck arrive at the decedent's house between 11:30 a.m. and noon. He also stated that the decedent came out and greeted a man who exited from the truck and that both men then went inside Peyton's house. The neighbor subsequently identified a photograph of

---

3. Both parties also address the court's ruling in light of the rules governing the admissibility of evidence to impeach a witness' character for truthfulness. When impeachment of a witness' character for truthfulness is the object, it is well settled under Virginia law that specific acts of untruthfulness or bad conduct are not admissible. *See Wynne v. Commonwealth*, 216 Va. 355, 356, 218 S.E.2d 445, 446 (1975); *Land v. Commonwealth*, 211 Va. 223, 225, 176 S.E.2d 586, 588 (1970); *Weimer v. Commonwealth*, 5 Va.App. 47, 52–53, 360 S.E.2d 381, 383–84 (1987). Maines' testimony regarding specific acts of bad conduct would not be admissible under this rule.

appellant's white pickup truck as similar to the truck he saw parked in front of decedent's house on the day of the murder.

When the decedent's body was found on the floor of the utility room of his mother's house, appellant's wristwatch was found less than two feet from the body. Bloody tennis shoe prints were found on both the utility room floor and on the back steps immediately outside the utility room door. The tread patterns on the shoe prints were inconsistent with the victim's shoes. When Richmond police officers first observed the appellant's white pickup truck at an apartment complex where his mother lived, they saw a pair of high-top tennis shoes in the bed of the truck and folded jeans in the cab. Later, appellant admitted he was wearing jeans when he visited the decedent the morning of the murder.

The overwhelming evidence of appellant's guilt can be attributed in good part to the appellant himself. The testimony provided by the decedent's neighbor was essentially admitted by appellant. While appellant did not admit he was at the decedent's house after 9:30 a.m., he later expressed uncertainty about the time. The appellant also admitted to the police that he drove his white pickup truck to decedent's house on the morning of the murder and that he and the decedent spent a few minutes talking at the truck before both entered decedent's house.

Appellant also explained the presence of his watch at the scene of the murder by stating he had lost it there because the watch had a "bad band" on it. Furthermore, although the police did not tell appellant that Peyton's cellular phone was missing from the house, appellant initiated an inquiry about whether the police had the property that was taken in the robbery of Peyton's house.

Finally, Sydow, appellant's cellmate, testified that appellant admitted killing Peyton. In that admission, appellant gave Sydow the following detailed account of his involvement in the crime. Appellant told Sydow he went to the decedent's house to collect money the decedent owed him for drugs, that the decedent refused to pay, that appellant returned to the house

later that day, and that on the second visit he hit and killed the decedent with the cellular telephone.

The improper hearsay admitted in this case tended to establish that the appellant was at the decedent's house on the day of the murder not only around 9:30 a.m. as he testified, but later that morning and closer to the time when the murder apparently occurred. The erroneous admission of this hearsay evidence is of *de minimis* import in light of the overwhelming independent evidence of appellant's guilt.

For the foregoing reasons, I would affirm.