Present:  All the Justices

JEFFERY A. REMINGTON

                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 010579              September 14, 2001

COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF THE CITY OF BUENA VISTA
                    Thomas H. Wood, Judge

     In this appeal, we review the capital murder conviction

and sentence of death imposed upon Jeffery Alan Remington.

                         I.  Proceedings

     Remington was tried before a jury on an indictment

charging him with the capital murder of Brent H. Parker in

violation of Code § 18.2-31(3), for "[t]he willful,

deliberate, and premeditated killing of any person by a

prisoner confined in a state or local correctional facility."

Remington and Parker were inmates at the Augusta Correctional

Center at the time of Parker's death.

     Upon motion of the defendant, and without objection from

the Commonwealth, the circuit court entered an order that

transferred the capital murder trial from Augusta County to

the City of Buena Vista.  At the conclusion of the guilt phase

of the proceedings, the jury found Remington guilty of capital

murder.

     In the penalty phase of the capital murder trial, the

jury fixed Remington's punishment at death, finding that he

represented a continuing serious threat to society and that his conduct in committing the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim.  See Code § 19.2-264.2.  The circuit court considered a report prepared by a probation officer pursuant to Code § 19.2-264.5 and sentenced the defendant in accord with the jury verdict.

II.  The Evidence Adduced During the Guilt Phase

As required by familiar principles of appellate review, we will recite the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party in the circuit court, and we will accord the Commonwealth the benefit of all inferences fairly deducible from that evidence. Dowden v. Commonwealth, 260 Va. 459, 461, 536 S.E.2d 437, 438 (2000).

On Sunday, January 16, 2000, the defendant, Parker, Michael William Lenz, and three other inmates attended a meeting of a group referred to as the Ironwood Kindred.  The meeting occurred in a room in Building J-5 at the Augusta Correctional Center in Augusta County.  Earl Jones, a corrections officer, supervised the six inmates who attended the meeting.  A door separated Officer Jones from the inmates.

2

However, the door contained a window which permitted Jones to observe the inmates.

Officer Jones "saw a commotion in the room." As he walked to the door, "three of the inmates ran out, and said . . . 'They're stabbing him.' " Officer Jones saw the defendant and Lenz stabbing Parker, who was "lying on the floor." Jones testified that Parker was on his back "making a feeble attempt to ward the knife strokes off from him. . . . Remington was on Parker's right; and as Parker would put his hand up, Remington would push [Parker's] hand aside, and stab him with . . . the knife. Lenz was on the other side, and doing basically the same thing."

Jones, who was unarmed, did not enter the room but opened the door and told Remington and Lenz to stop stabbing Parker. "They simply looked at [Jones], and went back to stabbing Parker." Parker was not armed with any type of weapon.

Jones used his radio to summon help. Two corrections officers, John Edward Simmons and Edward Lee Houching, responded. Jones, accompanied by Simmons and Houching, entered the room, and Simmons directed Remington and Lenz to "drop their weapons." Lenz placed his weapon on a table, but Remington "continued to hold onto his." Eventually, Remington surrendered his "homemade kni[fe]" to the officers. Jones testified that Remington "seemed really excited" and "happy."

3

Corrections Officer Simmons testified that he "saw Inmate Parker laying on the ground in a fetal position, with Inmate Lenz and Inmate Remington standing over top of him, stabbing him several times."  Simmons saw Remington stab Parker "[a]bout four or five times."

Corrections Officer Houching testified that when he responded to the crime scene, he "saw Mr. Parker, laying on the ground, in a fetal position.  Inmate Lenz and Inmate Remington were bent over, stabbing him."  Remington stabbed Parker "[a]round the chest area; the stomach — around the stomach."  Houching saw Remington stab Parker "eight to ten times."

Rita K. Dietz, a registered nurse, rendered assistance to Parker after the attack.  When she entered the room where the assault had occurred, Parker was "laying in the floor, and there was a pool of blood around his chest area."  Dietz described Parker's condition as critical.  She made that assessment because of "[t]he amount of blood; all his chest wounds — there was air coming out of his chest."

Dietz stated that Parker was placed on a stretcher "and he helped to roll himself on the sheet, with us; and we lifted him by the drawsheet . . . [a]nd, of course, blood was pouring out.  And we put him on the stretcher, and . . . we brought

4

him to the front to meet the ambulance as fast as we could." Parker died later that evening at a hospital.

Dr. Gregory Price Wenger, who was employed as an Assistant Chief Medical Examiner for the Western District of Virginia, performed an autopsy on Parker's body. Wenger qualified as an expert witness on the subject of forensic pathology. Wenger determined that Parker died from "multiple sharp force injuries." Parker had 68 stab wounds to his body. The wounds were "scattered over the surfaces of the body, involving his chest, his abdomen, his back, his arm – his right arm. [The wounds] penetrated vital internal organs." Parker had seven stab wounds in the left lung and three stab wounds in the right lung. Parker's liver contained seven stab wounds.

In response to the question, "did any one of these stab wounds by itself cause Mr. Parker to die?", Wenger replied: "Certainly the ones internally, that produced the injuries to the lungs and liver, were the most serious ones. There isn't any safe place that you can stab people. All these [wounds] had produced some bleeding. Together, just the large number of stab wounds that he had, even the soft tissue ones certainly contributed." Dr. Wenger testified that all the wounds occurred when Parker was alive, and all the wounds contributed to his death.

III.  Evidence Adduced During the Penalty Phase

During the penalty phase of the trial, the Commonwealth introduced the defendant's prior convictions for robbery, abduction, rape, and use of a firearm during the commission of robbery.  The Commonwealth also relied upon evidence that it presented during the guilt phase of the trial.

The defendant offered evidence in mitigation of his offense.  The defendant called Michael Lenz to the witness stand.  Lenz invoked his Fifth Amendment privilege against self-incrimination and refused to testify.  The defendant was permitted to read to the jury portions of a transcript of prior testimony that Lenz had given under oath.

According to Lenz's prior sworn testimony, Parker, Remington, and Lenz were members of the Ironwood Kindred, a group that practiced the Asatru religion.  Lenz testified: "[Parker and I had] been through a lot of times when – when it was close to fighting. . . .  And things just kept building and building and building.  And he had problems with me.  And I had problems with him.  I didn't like the way that he was portraying my religion to other people."  During the inmates' meeting on January 16, 2000, Lenz called Parker "up to the altar."  Lenz stated, "I asked – and I said to him, 'It's been a long, hard path between us.'  And he said, 'Yes, it is.'  And I pulled the knife out of my pocket.  And I said, 'Are you

6

trying to take it to the next step?'  And he said, 'Yes, I am.'  And so I stabbed him."

Lenz testified that when he started stabbing Parker, "Jeffery attacked him. . . .  Jeffery [Remington] attacked him as well.  And [Parker] wasn't ready for it.  [Parker] was surprised.  He – he was probably just as surprised as the people were at Pearl Harbor in 1941, though he shouldn't have been.  And then the other guys jumped up and – and tried to – to jump on Jeffery Remington."

In 1999, Remington received an excellent rating on his "inmate job performance review."  He also received his general education development certificate, commonly referred to as a G.E.D., issued by the Virginia Department of Education while he was incarcerated.

Joel Sickler, a criminologist and sentence consultant, testified without objection from the Commonwealth.  Sickler stated that Remington "had a very troubled upbringing."  His parents were divorced when he was five years old, and his biological father was "a tyrant, . . . an alcoholic, [and] a very violent man."  Remington was sexually molested as a child.  Remington, who has a history of drug addiction, began to use drugs at age 14 or 15.

The defendant testified during the penalty phase.  He stated that he had been raped when he was an inmate in the

Greensville Correctional Facility.  On another occasion at the Powhatan Correctional Center, an inmate tried to rape him. Remington testified that several inmates at the Augusta Correctional Center had told him that they intended to rape him, and he believed that Parker was involved in those threats of rape.  Remington also testified that Parker "threatened [his] life."  Remington informed Lenz about Parker's threats, and Lenz directed Remington to arm himself with a knife.

Remington admitted that he intended to confront Parker at the meeting on January 16, 2000.  When asked, "[s]o you went there armed with a deadly weapon, for a confrontation with Mr. Parker, to find a solution to the situation?", Remington responded:  "I took the knife there for my protection." Remington testified that Parker was incarcerated at the Augusta Correctional Center because he had killed a man by stabbing him with an ice pick.

## IV. Issues Previously Decided

The defendant raised several issues on appeal which have been decided adversely to his claims by our previous decisions.  Since we adhere to those rulings, we will not discuss them further.  The issues previously resolved are:

(i)  Whether the circuit "court erred in denying Remington's motion to strike the probability of future dangerousness as a basis for imposition of the death penalty

. . . , motion to strike future dangerousness and vileness as a basis for imposition of the death penalty . . . , and motion to declare the Virginia capital murder and death penalty statutes unconstitutional . . . on grounds that the statutes violate rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the [United States] Constitution and sections 8, 9 and 11 of Article 1 of the Virginia Constitution."  See Johnson v. Commonwealth, 259 Va. 654, 667, 529 S.E.2d 769, 776, cert. denied, 521 U.S. 981 (2000); Atkins v. Commonwealth, 257 Va. 160, 173 & n.6, 510 S.E.2d 445, 453 & n.6 (1999); Barnabei v. Commonwealth, 252 Va. 161, 178-79, 477 S.E.2d 270, 280 (1996), cert. denied, 520 U.S. 1224 (1997).

(ii)  Whether the circuit "court erred in denying Remington's motion to prohibit death-qualification of prospective jurors or for separate juries, as a violation of Remington's rights under the Virginia Constitution and under the Sixth and Fourteenth Amendments to the [United States] Constitution, as interpreted inter alia in Ballew v. Georgia, 435 U.S. 223 (1978)."  See Yeatts v. Commonwealth, 242 Va. 121, 127, 410 S.E.2d 254, 258 (1991), cert. denied, 503 U.S. 946 (1992); Eaton v. Commonwealth, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), cert. denied, 502 U.S. 824 (1991); Pruett v. Commonwealth, 232 Va. 266, 277-78, 351 S.E.2d 1, 7-8 (1986), cert. denied, 482 U.S. 931 (1987).

9

(iii)  Whether the circuit "court's refusal to grant Remington additional peremptory challenges violat[ed] his rights under the Virginia and [United States] Constitutions."  See Atkins, 257 Va. at 173-74, 510 S.E.2d at 453-54; Strickler v. Commonwealth, 241 Va. 482, 489, 404 S.E.2d 227, 232, cert. denied, 502 U.S. 944 (1991).

(iv)  Whether the circuit "court's denial of [Remington's] motion for a bill of particulars violat[ed] Remington's rights under the Virginia and federal constitutions as well as [Code § 19.2-230]."  See Walker v. Commonwealth, 258 Va. 54, 62-63, 515 S.E.2d 565, 569-70 (1999); Strickler, 241 Va. at 490-91, 404 S.E.2d at 232-33; Quesinberry v. Commonwealth, 241 Va. 364, 371-73, 402 S.E.2d 218, 223-24, cert. denied, 502 U.S. 834 (1991).

## V.  Pretrial Motions

Remington filed a motion requesting that the circuit court enter an order requiring that the Commonwealth's Attorney provide him the following:

> "A.5.  All memoranda, documents, and reports to, from, or between law enforcement officers connected with the subject matter of this case.
>
> . . . .
>
> "B.6.  The existence and identification of each occasion on which any potential witness has testified before any court, grand jury, or other tribunal or body or otherwise officially narrated in

relation to any of the defendants, the investigation, or the facts of this case.

"B.7. The existence and identification of each occasion on which each potential witness who was or is an informer, accomplice, or co-conspirator has testified before any court, grand jury, or other tribunal or body.

"B.8. Any and all information in any personnel files for any potential witness that arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the Commonwealth's evidence, including without limitation the personnel file of any co-defendant who is a potential witness and any official internal affairs, internal investigation, or public integrity investigation files relating to or connected with any potential witness who was or is a law enforcement officer.

. . . .

"B.11. All records and reports relating to any witness, including:

"(a) all juvenile detention, jail, prison, parole, probation, pre-sentence investigation, and any social service agency records;

. . . .

"(c) all records of any detention or court authority.

. . . .

"B.12. A list of all expert witnesses the prosecution intends to call at trial, along with each expert's qualification, the subject and a description of his or her contemplated testimony, and his or her report."

The defendant's motion also included the following requests:

11

"B.15.  The defendant moves for an Order requiring the Commonwealth to give defendant access to any and all evidence it may offer at any sentencing proceeding herein pursuant to section 19.2-264.4 of the Virginia Code, including without limitation (a) the names and addresses of all witnesses, a summary of their expected testimony and with respect to expert witnesses, a copy of their professional qualifications, resume or curriculum vitae; (b) any evidence of unadjudicated acts of misconduct for future dangerousness, and the alleged dates and witnesses to such acts; (c) a copy of any statement by a non-witness declarant to be offered into evidence and (d) an opportunity to inspect, test, and copy any physical evidence.

. . . .

"B.18.  The defendant moves for an Order requiring the Commonwealth's Attorney to disclose if there was an informant involved in regard to the investigation and charging of the indictments in this case, regardless of whether said informant will be called as a witness at trial, and to state the name and address of the informant pursuant to Roviaro v. United States, 353 U.S. 53 (1957), and other pertinent authority, or claim the privilege not to do so.  If any undercover agent or informant were [sic] employed by the Commonwealth, state the method and amount of compensation paid the undercover agent and whether he was a sworn law enforcement officer, and if so, with which law enforcement agency and on what date he was sworn in as a law enforcement officer."

Remington claims that the circuit court's failure to grant his requested discovery violated his rights under the federal constitution and Art. I, § 8 of the Constitution of Virginia.  Remington's assertions are without merit.

Paragraphs 12 and 15 of the defendant's discovery request were improper because he had no general right to discovery of

12

the Commonwealth's witnesses.  We have consistently held that a defendant does not have a "general right to discovery of witness statements, reports, or other memoranda possessed by the Commonwealth."  Clagett v. Commonwealth, 252 Va. 79, 89, 472 S.E.2d 263, 269 (1996), cert. denied, 519 U.S. 1122 (1997); accord Bunch v. Commonwealth, 225 Va. 423, 436, 304 S.E.2d 271, 278, cert. denied, 464 U.S. 977 (1983).

According to Remington, he sought exculpatory evidence and impeachment material in his discovery requests A.5, B.6, B.7, B.8, B.11(a) and 11(c), and B.18.  However, the circuit court entered an order which required the Commonwealth "to provide [to the defendant] all exculpatory evidence to impeach witnesses."  Because the Commonwealth was required to provide Remington with all exculpatory evidence necessary to impeach witnesses, his constitutional rights, if any, were not abridged.  Furthermore, the Commonwealth provided the defendant "complete access to the Commonwealth's investigation file," and the Commonwealth permitted the defendant to "examine the Commonwealth's Attorney's entire prosecution file."

Remington also asserts that the circuit court's refusal to permit him to obtain the information sought in Paragraphs B.7 and B.18 violated "his federal right to 'the disclosure of an informer's identity, or of the contents of his

13

communication [that] is relevant and helpful to the defense of the accused, or is essential to a fair determination of a cause.' " Remington's contention is without merit. Remington concedes that no informant testified at trial, and he fails to articulate how such information would have been of assistance to his defense. Therefore, we conclude that the circuit court did not err in denying his discovery requests.

## VI. Voir Dire Issues

The defendant argues that the circuit court erred by removing two members of the jury panel from the venire because of their religious convictions in violation of the First and Fourteenth Amendments to the federal constitution and Article I, §§ 11 and 16 of the Constitution of Virginia. The defendant's contentions are without merit.

Sharon Martin testified as follows during voir dire:

"THE COURT: Do you have any religious, philosophical, or moral beliefs which would prevent or substantially impair your ability to convict a person of a crime which potentially carried a death penalty?

"MS. MARTIN: I don't believe in the death penalty.

"THE COURT: You don't believe in it?

"MS. MARTIN: No.

"THE COURT: All right. Now, let me ask you, Ms. Martin . . . The first question – and I just want to go over it again. Are your beliefs . . . Is your opposition to the death penalty such that you

14

would not – that you would never vote to convict a person of a crime which could impose – which could result in the death penalty?

"MS. MARTIN:  I don't believe so.

"THE COURT:  All right.  Okay.  So I guess it goes without saying, then, that if the person were convicted of capital murder, you would not vote for the – would not ever vote for the death penalty?

"MS. MARTIN:  I don't think I would ever.

"THE COURT:  All right.

"[COMMONWEALTH'S ATTORNEY]:  You feel very strongly in your opposition against the death penalty —

"MS. MARTIN:  Yes.  Yes.

"[COMMONWEALTH'S ATTORNEY]:  . . . and you could not impose a death penalty, no matter what the evidence is?

"MS. MARTIN:  I don't think I ever could.

. . . .

"[DEFENDANT'S ATTORNEY]:  Ms. Martin, you – you took an oath at the start of this thing, to – to do what . . . your responsibilities are, and – and . . . Suppose Judge Wood told you that the law of Virginia is that under certain circumstances – and I mean really horrible circumstances – the death penalty is – is proper, appropriate; but that under other circumstances, with mitigation, and question marks, that it isn't appropriate . . . Do you think that you could follow your oath, and impose the death penalty, if the circumstances were such that, 'By golly, he's got it coming to him?'

"MS. MARTIN:  I really don't believe in it."

Barbara Pentecost testified as follows:

"THE COURT:  Ms. Pentecost, at various stages of this proceeding, the Court will be – will give the instructions to the jury.  The instructions contain the law of the State that applies to this case.  And it will be the duty of the jury to follow those instructions.

"I'm going to go over a couple of these with you.

"The Defendant is presumed to be innocent.  You shall not assume that he is guilty because he has been indicted and he's on trial.  This presumption of innocence goes with him throughout the trial, and is enough to require you to find him not guilty unless and until the Commonwealth proves each and every element of the offense beyond a reasonable doubt.

"Ms. Pentecost, do you understand that?

"MS. PENTECOST:  Yes.

"THE COURT:  Do you have any type of moral or philosophical beliefs that would prevent you from following that instruction?

"MS. PENTECOST:  If it has anything to do with the – the lethal injection . . . I do not believe in that.  I don't believe in that.

"THE COURT:  All right.

"[COMMONWEALTH'S ATTORNEY]:  Judge, could you repeat what she said?  I just couldn't hear any of it.

"THE COURT:  She said she doesn't believe in lethal injection.

"MS. PENTECOST:  Putting anyone to death – I don't believe in that.

"THE COURT:  All right.  Well, let me just ask you that next question then, Ms. Pentecost, to see exactly how you feel about it – because we are required to ask your views about the death penalty.

16

"Would you . . . If you were on the jury, and if the jury found a person guilty of capital murder . . . Well, let me ask you this: Could you ever vote to – to find a person guilty of capital murder? If there – there was . . .

"MS. PENTECOST: I . . . I don't know. I think if it was anything to do with putting him to death, I don't think that I could do that.

"THE COURT: All right. Well, let me ask you this one other question. In the event that they did find him guilty of capital murder, which could carry the death penalty, could you . . . Would you ever impose – be able to impose a death penalty?

"MS. PENTECOST: I wouldn't vote to do it. I . . . Anything to do with somebody's life . . . I – I couldn't do that.

"THE COURT: All right. All right, Ms. Pentecost.

. . . .

"[DEFENDANT'S ATTORNEY]: If you took an oath to uphold the law of the State of Virginia, and the law of the State of Virginia is that sometimes people do things that – that they deserve the death penalty, and sometimes they don't deserve the death penalty, could you abide by your oath, and -- and follow the law that the Judge instructs you about?

"MS. PENTECOST: I just wouldn't be able to vote for somebody to be put to death. I couldn't do that. I couldn't . . . That's my belief. That's . . .

"[DEFENDANT'S ATTORNEY]: Well, you may or may not vote for it, but would you consider it?

"MS. PENTECOST: I don't think I could live with myself if I had anything to do with putting someone to death."

17

On appeal, we must give deference to the circuit court's determination whether to exclude a prospective juror because that court was able to see and hear the prospective juror respond to questions posed. Green v. Commonwealth, 262 Va. 105, 115, 546 S.E.2d 446, 451 (2001). The circuit court is in a superior position to determine whether a prospective juror's responses during voir dire indicate that the prospective juror would be impaired or prevented from performing the duties of a juror. Schmitt v. Commonwealth, 262 Va. 127, 139, 547 S.E.2d 186, 195 (2001); Lovitt v. Commonwealth, 260 Va. 497, 510, 537 S.E.2d 866, 875 (2000); Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), cert. denied, 530 U.S. 1218 (2000). And, the circuit court's decision to remove a juror for cause will not be reversed on appeal unless that decision constitutes manifest error. Green, 262 Va. at 116, 546 S.E.2d at 451; Schmitt, 262 Va. at 139, 547 S.E.2d at 195; Clagett, 252 Va. at 90, 472 S.E.2d at 269; Roach v. Commonwealth, 251 Va. 324, 343, 468 S.E.2d 98, 109, cert. denied, 519 U.S. 951 (1996). We have also stated that a prospective juror should be excluded for cause based on the juror's views about the death penalty if those views would "substantially impair or prevent the performance of a juror's duties in accordance with his oath and the court's instructions." Schmitt, 262 Va. at 139, 547 S.E.2d at 195.

Contrary to Remington's assertions, the record clearly indicates that Martin and Pentecost were not removed from the venire because of their religious beliefs. Rather, Martin and Pentecost stated that they would not vote to impose the penalty of death. We hold that the circuit court did not err in removing Martin and Pentecost from the jury panel because their responses demonstrated that their personal objections to the death penalty would have substantially impaired or prevented them from performing their duties as jurors. See Schmitt, 262 Va. at 139, 547 S.E.2d at 195; Vinson, 258 Va. at 468, 522 S.E.2d at 176; Barnabei, 252 Va. at 173, 477 S.E.2d at 277; Yeatts, 242 Va. at 134-35, 410 S.E.2d at 262-63.

## VII.  Guilt Phase Issues

### A.

Remington moved to strike the Commonwealth's evidence on the basis that the evidence did not establish that he had inflicted the fatal wounds upon Parker. The circuit court denied the motion. Remington argues in this Court that the circuit court erred in denying his motion because "only the immediate slayer may be tried for capital murder; others, such as Remington, may be tried only for first degree murder. . . . For the same reasons, the [circuit] court erred in denying [Remington's] proffered [jury] instructions . . . which accurately state law explaining Virginia's 'triggerman rule'

19

and the exclusion of principals in the second degree from eligibility for capital murder."

Remington's contentions are without merit. In Coppola v. Commonwealth, 220 Va. 243, 256-57, 257 S.E.2d 797, 806 (1979), cert. denied, 444 U.S. 1103 (1980), we held that a defendant who "jointly participated in [a] fatal beating" was subject to conviction and punishment for capital murder when the other requisite elements were established. In Strickler, we held that when two or more persons took a direct part in inflicting fatal injuries, each participant in the murder was an immediate perpetrator for purposes of the capital murder statutes. 241 Va. at 495, 404 S.E.2d at 235.

In the present case, the evidence established beyond a reasonable doubt that Remington and Lenz jointly participated in the fatal stabbing of Parker. As we have already stated, Remington stabbed Parker in the chest and stomach area at least "eight to ten times" and, according to the medical examiner, Parker sustained 68 separate stab wounds, all of which contributed to his death. Thus, the circuit court did not err in denying Remington's motion to strike.

The defendant argues that even if the circuit court did not err in denying his motion to strike, "there is certainly sufficient evidence upon which a reasonable jury could [have found that the defendant was] merely a principal in the second

degree."  Continuing, the defendant says that the circuit court "erred in withholding that option from the jury by refusing to give [his] proffered instructions 5E, 6F, and 9I." We disagree.

The defendant's proffered instruction 5E would have instructed the jury that he was a principal in the second degree unless he inflicted the fatal blows that caused Parker's death.  We rejected an identical instruction that was proffered in Strickler because such instruction was premised upon the theory that the killing in that case was accomplished by a sole perpetrator, and there was no evidence of record which would have supported that theory.  See Strickler, 241 Va. at 495, 404 S.E.2d at 235.  The circuit court properly refused the proposed instruction in this case because the evidence of record does not support the theory that Lenz acted alone.  Rather, the evidence established beyond a reasonable doubt that Remington and Lenz jointly participated in Parker's death.

The defendant's proposed instruction 6F would have instructed the jury that Remington must have been an active and immediate participant in the murder.  The circuit court properly refused that instruction because that legal principle was included in other instructions given to the jury.  Burns v. Commonwealth, 261 Va. 307, 343, 541 S.E.2d 872, 895 (2001);

21

Jackson v. Commonwealth, 255 Va. 625, 650, 499 S.E.2d 538, 554 (1998), cert. denied, 525 U.S. 1067 (1999); Stockton v. Commonwealth, 227 Va. 124, 145, 314 S.E.2d 371, 384, cert. denied, 469 U.S. 873 (1984); Howard v. Commonwealth, 210 Va. 674, 679, 173 S.E.2d 829, 833 (1970).

The defendant's proposed jury instruction 9I would have instructed the jury that if it believed that "Parker had already been fatally wounded by Michael Lenz before Remington entered into the attack upon Parker, or if [it had] a reasonable doubt thereof, then [it] shall find Remington not guilty of capital murder." The circuit court did not err in refusing this instruction because the substance of this instruction was included in other instructions given by the court. Id.

## B.

Remington argues that the circuit court erred in failing to give the jury his "proffered instructions on the law of grades of homicide and of lesser-included offenses to capital murder when the evidence supported those instructions." Remington's proffered instruction 1A would have informed the jury that "[e]very unlawful homicide is presumed in law to be murder in the second degree." Proffered instruction 12L would have informed the jury that if it found the defendant was not guilty beyond a reasonable doubt of capital murder, first-

22

degree murder, or second-degree murder, the jury could find the defendant guilty of malicious wounding. Proposed instruction 13M would have instructed the jury about the different grades of homicide, and if the jury had a reasonable doubt as to whether the defendant was guilty of capital murder or second-degree murder, the jury was required to find him guilty of second-degree murder. The defendant's proffered instruction AA would have instructed the jury that once the Commonwealth proved an unlawful killing, the jury was entitled to infer that there was malice and the act was murder in the second degree. The defendant's proffered instruction CC would have instructed the jury about the elements of second-degree murder. The defendant's proposed instruction DD would have explained to the jury, among other things, that if the jury had a reasonable doubt whether the defendant was guilty of first-degree murder or second-degree murder, it was required to find him guilty of second-degree murder.

The circuit court did not err in refusing the defendant's proposed jury instructions. The evidence of record does not support jury instructions for second-degree murder or malicious wounding. As we stated in Buchanan v. Commonwealth, 238 Va. 389, 409, 384 S.E.2d 757, 769 (1989), cert. denied, 493 U.S. 1063 (1990), "[a] second degree murder instruction is only appropriate where it is supported by the evidence."

23

Accord Justus v. Commonwealth, 222 Va. 667, 678, 283 S.E.2d 905, 911 (1981), cert. denied, 445 U.S. 983 (1982); see also Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998) (applying the same principle to a proffered instruction for malicious wounding).  Moreover, the evidence asserted in support of such an instruction "must amount to more than a scintilla."  Justus, 222 Va. at 678, 283 S.E.2d at 911; accord Orbe v. Commonwealth, 258 Va. 390, 398, 519 S.E.2d 808, 813 (1999), cert. denied, 529 U.S. 1113 (2000); Hatcher v. Commonwealth, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978).

## C.

The defendant argues that the evidence of premeditation was insufficient as a matter of law and, therefore, his capital murder conviction must be set aside.  We disagree with the defendant.

We have stated that the "question whether a defendant is guilty of a premeditated killing of the victim is usually a jury question.  The intention to kill need not exist for any specified length of time prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill."  Weeks v. Commonwealth, 248 Va. 460, 477, 450 S.E.2d 379, 390 (1994), cert. denied, 516 U.S. 829, (1995); accord Clozza v. Commonwealth, 228 Va. 124, 134, 321

24

S.E.2d 273, 279 (1984), cert. denied, 469 U.S. 1230 (1985);

Akers v. Commonwealth, 216 Va. 40, 48, 216 S.E.2d 28, 33

(1975); Bradshaw v. Commonwealth, 174 Va. 391, 399, 4 S.E.2d

752, 755 (1939); see also Breard v. Commonwealth, 248 Va. 68,

84, 445 S.E.2d 670, 680, cert. denied, 513 U.S. 917 (1994).

Additionally, we stated in Smith v. Commonwealth, 220 Va.

696, 700-01, 261 S.E.2d 550, 553 (1980):

> "To premeditate means to adopt a specific intent to
> kill, and that is what distinguishes first and
> second degree murder.  The intent to kill must come
> into existence at some time before the killing; it
> need not exist for any particular length of time.
> As we said in Pannill v. Commonwealth, 185 Va. 244,
> 255, 38 S.E.2d 457, 463 (1946), quoting from
> McDaniel v. Commonwealth, 77 Va. 281, 284 (1883),
> 'it is necessary that the killing should have been
> done on purpose and not by accident or without
> design. . . .'  The exact state of the defendant's
> mind at the time of killing is the crucial factor in
> determining intent.  'It is the will and purpose to
> kill, not necessarily the interval of time, which
> determine the grade of the offense.'  Akers v.
> Commonwealth, 216 Va. 40, 48, 216 S.E.2d 28, 33
> (1975)."

Accord Rhodes v. Commonwealth, 238 Va. 480, 485, 384 S.E.2d

95, 98 (1989).  We hold that the evidence in this case was

sufficient to permit the jury to find that the defendant acted

with premeditation.  Certainly, the jury was entitled to find

that the defendant had a specific intent to kill the victim,

based upon the defendant's acts of stabbing the victim at

least eight to ten times in the stomach and chest.

25

Remington also argues that the circuit court erred in refusing to give his proffered jury instructions 2B, 3C, or 4D, which explained premeditation. Proffered instruction 2B would, among other things, have defined the word "premeditation." Instruction 3C would have instructed the jury regarding capital murder, second-degree murder, and premeditation. Proffered instruction 4D would have instructed the jury regarding capital murder, second-degree murder, and premeditation.

The circuit court properly refused the proposed instructions. As we have already concluded, the evidence of record does not support a finding of second-degree murder and, therefore, the defendant's proposed instructions 3C and 4D were improper. The circuit court was not required to give instruction 2B, which purportedly defined premeditation, because that instruction was duplicative of another instruction which instructed the jury on premeditation.

VIII. Penalty Phase

A.

Remington argues that the circuit court erred in admitting the post-sentence report because the report did not contain a victim impact statement and, therefore, he is entitled to a new sentencing hearing. We disagree.

Code § 19.2-264.5 states:

"When the punishment of any person has been fixed at death, the court shall, before imposing sentence, direct a probation officer of the court to thoroughly investigate the history of the defendant and any and all other relevant facts, to the end that the court may be fully advised as to whether the sentence of death is appropriate and just. Reports shall be made, presented and filed as provided in § 19.2-299 except that, notwithstanding any other provision of law, such reports shall in all cases contain a Victim Impact Statement. Such statement shall contain the same information and be prepared in the same manner as Victim Impact Statements prepared pursuant to § 19.2-299.1. After consideration of the report, and upon good cause shown, the court may set aside the sentence of death and impose a sentence of imprisonment for life."

As we have stated, the Crime Victim and Witness Rights Act, of which Code § 19.2-264.5 is a part, was enacted to "preserve the right of victims of crimes to have the impact of those crimes upon their lives considered as part of the sentencing process, if that is their wish, and to protect their privacy thereafter." Beck v. Commonwealth, 253 Va. 373, 384, 484 S.E.2d 898, 905, cert. denied, 522 U.S. 1018 (1997). The statutory requirement that a post-sentence report contain a victim impact statement does not confer any rights upon a capital murder defendant, and the defendant was not prejudiced by the omission of a victim impact statement in the post-sentence report.

Remington also argues that the post-sentence report contained hearsay statements and that the parole officer who prepared the report did not verify information contained in a

27

prior report upon which she relied. The defendant claims that the circuit court abused its discretion in accepting the post-sentence report, and he is entitled to a new sentencing proceeding.

We disagree with the defendant. In Stamper v. Commonwealth, 220 Va. 260, 279, 257 S.E.2d 808, 821 (1979), cert. denied, 445 U.S. 972 (1980), we stated:

> "Code § 19.2-264.5 provides only that a thorough investigation be conducted; it does not specify that any particular procedure be used in compiling the report or that any particular information be included therein. Decisions concerning such matters must by necessity be left largely to the discretion of the trial court and the individual probation officer."

We hold that the circuit court did not abuse its discretion in admitting the post-sentence report. The probation officer who compiled the report relied upon information that she had gathered from an earlier pre-sentence report. She verified the information with the defendant. Remington, just as the defendant in Stamper, was given the opportunity to cross-examine the probation officer thoroughly on the report and to introduce relevant evidence on his own behalf to supplement or contradict the report. See Stamper, 220 Va. at 279, 257 S.E.2d at 821. And, we also observe that we have held that a post-sentence report may contain hearsay statements. Johnson, 259 Va. at 667-68, 529 S.E.2d at 776;

Breard, 248 Va. at 75, 445 S.E.2d at 675; O'Dell v.

Commonwealth, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08,

cert. denied, 488 U.S. 871 (1988).

B.

The defendant contends that the circuit court "erred in employing instruction 9 in the sentencing phase, and in failing to give Remington's proposed instruction AAA . . . . Failure to give proffered instruction AAA in place of instruction 9 presented the jury with an unconstitutionally vague term, 'probability,' that provided constitutionally inadequate guidance to jurors on the critical sentencing issue of future dangerousness."  We disagree with the defendant.

Proffered instruction AAA would have required the jury to conclude that there was "an overwhelming probability that [the defendant] would commit criminal acts of violence that would constitute a continuing serious threat to society," in order to impose the death penalty based upon the future dangerousness aggravating factor.  Consistent with Code § 19.2-264.4(C), instruction 9 defined future dangerousness as "a probability that [the defendant] would commit criminal acts of violence that would constitute a continuing serious threat to society."  Contrary to Remington's assertions, this Court has held that the statutory definition of future dangerousness is not unconstitutionally vague.  See Johnson, 259 Va. at 667,

29

529 S.E.2d at 776; Atkins, 257 Va. at 173 & n.6, 510 S.E.2d at 453 & n.6; Barnabei, 252 Va. at 178-79, 477 S.E.2d at 280. Therefore, the circuit court did not err by refusing to grant proffered instruction AAA.

C.

The defendant argues that the circuit court erred in refusing his motion to impose a life sentence based upon mandatory proportionality principles because, the defendant says, "no other Virginia cases with similar facts involving the inmate victims have resulted in the death penalty." The defendant's contention is without merit. Contrary to the defendant's assertion, the circuit court was not required to conduct a proportionality analysis. Lovitt, 260 Va. at 518, 537 S.E.2d at 880.

We do note, however, that Code § 19.2-264.5 permits a circuit court, upon good cause shown, to set aside the sentence of death and impose a sentence of imprisonment for life. However, the circuit court refused to do so and concluded that "the evidence clearly justifies what the jury has done" and that there was no question that the imposition "of the death penalty in this case is proportionate."

D.

The defendant argues that the circuit court erred "in employing a verdict form in the sentencing phase that was

defective for three reasons, the first of which is that the form did not specify clearly to the jury that it could find either or both aggravating factors and still impose a life sentence based on mitigation evidence.  Second, it made no reference to the reasonable doubt standard by which such factors must be found; it thereby conflicted [with] instructions given to the jury. . . .  Third, the verdict form in its final paragraph implied that, even if the Commonwealth failed to prove an aggravating factor, a life sentence could not be imposed unless there was some quantum of mitigating evidence in the case."

We will not consider the defendant's contentions because they are procedurally defaulted.  At trial, the defendant objected to the penalty phase verdict form solely on the basis that the form did not modify the term "probability" in the definition of future dangerousness with the word "overwhelming."  On appeal, he asserts for the first time that the verdict form was defective for the reasons discussed in Atkins, 257 Va. at 177-79, 510 S.E.2d at 456-57.  We hold that any questions concerning the verdict form in this case are procedurally defaulted because the defendant did not raise these issues in the circuit court.  Rule 5:25; Lenz v. Commonwealth, 261 Va. 451, 472, 544 S.E.2d 299, 311 (2001);

31

Burns, 261 Va. at 343 n.16, 541 S.E.2d at 896 n.16; Orbe, 258 Va. at 403 n.13; 519 S.E.2d at 816 n.13.

### E.

The defendant argues that the circuit court erred in granting the Commonwealth's motion in limine to exclude reference to the victim's murder conviction and life sentence. Continuing, the defendant says that the court erred in instructing the jury to disregard a question his counsel raised about the victim's criminal record after the court admitted evidence of the victim's murder conviction because such testimony was relevant to the defendant's state of mind. Additionally, the defendant argues that the circuit court's ruling violated Code § 19.2-264(B), this Court's prior decisions, and the defendant's constitutional rights to present mitigation evidence. We disagree with the defendant's contentions.

Code § 19.2-264.4(B) states:

"In cases of trial by jury, evidence may be presented as to any matter which the court deems relevant to sentence, except that reports under the provisions of § 19.2-299, or under any rule of court, shall not be admitted into evidence.
"Evidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense. Facts in mitigation may include, but shall not be limited to, the following: (i) the defendant has no significant history of prior criminal activity, (ii) the capital

32

felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, (iii) the victim was a participant in the defendant's conduct or consented to the act, (iv) at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired, (v) the age of the defendant at the time of the commission of the capital offense or (vi) mental retardation of the defendant."

Code § 19.2-264.4(B) simply did not require the circuit court to admit in evidence the victim's criminal history. The defendant wanted to introduce evidence of the victim's prior criminal record to show that the victim had been convicted of murder, which was not relevant to any issues in this proceeding. Parker's prior conviction had no relevance to the issue whether the defendant's acts were vile, inhuman, or showed depravity of mind, and the victim's criminal record was not relevant to the issue whether the defendant would constitute a serious, continuing threat to society. Lenz, 261 Va. at 466, 544 S.E.2d at 307. And, as we have recently held, generally, a defendant does not have a constitutional right to present evidence of a victim's criminal history. Id.

### F.

The defendant argues that the circuit court erred in denying his motion to set aside the verdict or grant a new sentencing hearing because he was denied "constitutional due process and his common law right and right under . . . Code

33

§ 19.2-259 in that [he] was absent from the courtroom during the jury's entire sentence deliberation through action of the Commonwealth." We disagree with the defendant.

Counsel concluded their closing arguments in the penalty phase on August 23, 2000. With the consent of the defendant and the Commonwealth, the jury was given the option of beginning deliberations that evening or the following morning. The jury decided to return the following morning to commence deliberations. The jury returned at 9:00 the next morning and went directly into the jury room to commence deliberations.

At 8:30 that same morning, Remington, who was wearing an electronic restraining belt, was accidentally shocked. He was taken to a hospital for observation. When Remington's defense counsel arrived at the courthouse, the circuit court informed them what had happened and asked whether defense counsel had any objections to deliberations proceeding in Remington's absence. Counsel had no objections, and the defendant's lead counsel stated, "I think we should go ahead."

During a later hearing, the circuit court made findings about the sequence of events relevant to our disposition of the defendant's contentions because the circuit court wanted to be sure that the record accurately reflected those events.

> "THE COURT: Closing arguments and the jury instructions on the penalty phase were all concluded on the afternoon of the twenty-third of August. And

34

at that point, the jury, with the consent of both sides – both sides . . . The jury was given the option of – of continuing their deliberations at that point, or for going home for the evening and returning at nine o'clock in the morning.  And they – they opted to go home, and return for the fourth day of the trial, at nine o'clock.

"[DEFENDANT'S COUNSEL]:  Yes, sir.

"THE COURT:  Your recitation of the facts seems to indicate that the jury came into the Courtroom, was convened, and sent out.  That isn't what happened.  The jury went directly to the jury room.  This jury never had any inkling that Mr. Remington wasn't here.  There was no reason – no way in the world – for them ever to know that.  There were no communications between this Court, or any Bailiff of this Court, with that jury, that would indicate that Mr. Remington wasn't here.

"The jury went out at 9:00.  The jury verdict was actually received by this Court at 11:10.  And what in effect happened was that the jury returned . . . The jury knocked on the door at 10:40, the time – is the time I report.  And they were advised by the Bailiff that there would be a delay, to – they would have to remain in the jury room until – until we could resume.  And then Mr. Remington was returned at 11 o'clock.

"So that's what happened.  But I . . . If you're suggesting that somehow this jury was present in the Courtroom, in the jury box, when the Defendant wasn't here – that – that didn't – that never happened."

"[DEFENDANT'S COUNSEL]:  I'm not suggesting that.

"THE COURT:  Okay.  All right.  I just wanted to make sure of that.

. . . .

"THE COURT:  Because there isn't [any] question about the fact that this man – there was an . . .

35

And I don't know what happened.  He had a security device on him, and it – he received a shock.  And we were advised – all of us were advised that he was taken to the hospital for a – for tests, and some observation – whatever; and that he was gone from approximately nine o'clock until approximately 11 o'clock.  That's – that's a fact.  And the jury did deliberate during that process."

Rejecting the defendant's motion to set aside the verdict because he was not present during the jury's deliberations, the circuit court stated:

"With respect to the absence of the Defendant . . . Gentlemen, you know, he . . . I suppose the record needs to reflect that Mr. Remington wasn't present in the Courtroom during the deliberations on the guilt phase; that Mr. Remington was, at all stages of this proceeding, in custody.  In fact, he was serving a life sentence, plus — plus . . . a number of years.  And he in fact was in a holding cell.  He was never in the Courtroom during the deliberations.  No Defendant who is in custody is ever in the Courtroom during deliberations.  They're always in some secure place — for those Courtrooms that have a secure place.

"The jury deliberations were in private.  There were no questions.  There were no communications between any officer of this Court, and – with this jury.  And no rulings were made . . . In fact, nothing happened out of the absence – or out of the presence of this Defendant.  And, in fact, the Court was requested to allow the jury to deliberate; and the Court did that – at the request of counsel.

"So I'm going to overrule that Motion."

The circuit court did not err in denying the defendant's motion to set aside the jury verdict.  Initially, we point out that the defendant waived any purported claim that he might have had because his counsel specifically agreed to permit the

36

jury to begin its deliberations in the defendant's absence. Additionally, this defendant would not have been present in the courtroom while the jury was deliberating. As the circuit court pointed out, for security reasons, a defendant in custody would have been placed in a holding cell during the jury's deliberations. And, the jury was unaware that the defendant was in a hospital, away from the courthouse.

Furthermore, the defendant's absence from the courthouse while the jury was deliberating did not violate Code § 19.2-259. This statute provides in relevant part that "[a] person tried for felony shall be personally present during the trial." The phrase, "during the trial," means "every stage of the trial from his arraignment to his sentence, when anything is to be done which can affect his interest." Palmer v. Commonwealth, 143 Va. 592, 605, 130 S.E. 398, 402 (1925); accord Jones v. Commonwealth, 227 Va. 425, 428, 317 S.E.2d 482, 483-84 (1984). Code § 19.2-259 does not require a defendant's presence in the courtroom while a jury is deliberating in another room. We have stated that a defendant "must be present on his arraignment, when any evidence is given or excluded, when the jury is charged, when the trial court wishes to communicate with the jury in answering questions by [it], and when the jury receives further instructions." Palmer, 143 Va. at 605, 130 S.E.at 402. We

have not held, and expressly decline to hold, that a defendant has a statutory right to be in a courtroom while the jury is deliberating in another room.

We recognize that the Fourteenth Amendment due process clause and the Sixth Amendment to the federal constitution confer upon a defendant the right to be present at trial. For instance, the Supreme Court has stated:

> "The Court has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' Snyder v. Massachusetts, 291 U.S. 97, 105-106 (1934). Although the Court has emphasized that this privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow,' id., at 106-107, due process clearly requires that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence,' id., at 108. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."

Kentucky v. Stincer, 482 U.S. 730, 745 (1987); accord United States v. Gagnon, 470 U.S. 522, 526-27 (1985). However, neither the federal constitution nor the common law of this Commonwealth confers upon a defendant, who would have otherwise been confined in a holding cell, a right to be present in a courtroom while the jury is in a different room deliberating, and nothing has occurred in the courtroom which

38

would have affected the defendant's interests. As the circuit court found, the jury deliberations were conducted in private; there were no questions from the jury; there were no communications between any officer of the court and the jury; and no rulings were made. As the circuit court stated, "nothing happened . . . out of the presence of [the] Defendant." Accordingly, we hold that the defendant's rights were not violated.

## IX. Statutory Review

### A.

Pursuant to Code § 17.1-313(C)(1), we must determine whether the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary factor. Remington does not contend that the sentence of death imposed upon him was under the influence of passion, prejudice, or other arbitrary factor. Nonetheless, we have reviewed the evidence of record, and we find no evidence that any such factor was present or influenced either the jury's or the circuit court's sentencing decision.

### B.

Code § 17.1-313(C)(2) requires this Court to determine whether the sentence of death in this case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Pursuant to

39

Code § 17.1-313(E), we have accumulated the records in all capital murder cases reviewed by this Court. The records include not only those capital murder cases in which the death penalty was imposed, but also those cases in which the circuit court or jury imposed a life sentence, and the defendant petitioned this Court for an appeal.

### C.

The defendant argues that "this Court should impose a life sentence because death is 'excessive or disproportionate to the penalty imposed in similar cases.' " Continuing, the defendant says that this Court has previously approved the death penalty for an inmate convicted of capital murder of another inmate in only one case, Payne v. Commonwealth, 233 Va. 460, 357 S.E.2d 500, cert. denied, 484 U.S. 933 (1987). The defendant also requests that this Court consider the records of three inmates who were charged with the capital murder of other inmates and who were not sentenced to death.

We have held that when conducting our proportionality review, we must determine whether other sentencing bodies in this Commonwealth generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant. Lenz, 261 Va. at 470, 544 S.E.2d at 310. Thus, the fact that the defendant was an inmate, who killed another inmate, is only one factor that we consider in

determining whether other juries generally impose the sentence of death for similar crimes.  As we recently held, Code § 17.1-313(C)(2) "does not require that this Court confine its review to crimes that are identical; rather, we consider comparable or similar crimes."  Lenz, 261 Va. at 471, 544 S.E.2d at 310.

We have examined the records in all capital murder cases previously reviewed by this Court when, as here, the death penalty was imposed based upon Code § 18.2-31(3), the capital murder of any person while the defendant was confined in a state or local correctional facility.  See Lenz v. Commonwealth, 261 Va. 451, 544 S.E.2d 299;  Payne v. Commonwealth, 233 Va. 460, 357 S.E.2d 500.  As requested by the defendant, we have reviewed the records of the three inmates who were charged with the capital murder of other inmates, but were not sentenced to death.  Additionally, we have examined the records in all capital murder cases previously reviewed by this Court when the sentence of death was based upon vileness and future dangerousness, and the victim died as a result of multiple stabbings.  See Lenz v. Commonwealth, 261 Va. 451, 544 S.E.2d 299; Johnson v. Commonwealth, 259 Va. 654, 529 S.E.2d 769; Wilson v. Commonwealth, 249 Va. 95, 452 S.E.2d 669, cert. denied, 516 U.S. 841 (1995); Breard v. Commonwealth, 248 Va. 68, 445

S.E.2d 670; <u>Murphy</u> v. <u>Commonwealth</u>, 246 Va. 136, 431 S.E.2d 48, <u>cert.</u> <u>denied</u>, 510 U.S. 928 (1993); <u>Satcher</u> v. <u>Commonwealth</u>, 244 Va. 220, 421 S.E.2d 821 (1992), <u>cert.</u> <u>denied</u>, 507 U.S. 933 (1993); <u>King</u> v. <u>Commonwealth</u>, 243 Va. 353, 416 S.E.2d 669, <u>cert.</u> <u>denied</u>, 506 U.S. 957 (1992); <u>Mu'Min</u> v. <u>Commonwealth</u>, 239 Va. 433, 389 S.E.2d 886 (1990), <u>aff'd</u>, 500 U.S. 415 (1991); <u>Watkins</u> v. <u>Commonwealth</u>, 238 Va. 341, 385 S.E.2d 50 (1989), <u>cert.</u> <u>denied</u>, 494 U.S. 1074 (1990); <u>Hoke</u> v. <u>Commonwealth</u>, 237 Va. 303, 377 S.E.2d 595, <u>cert.</u> <u>denied</u>, 491 U.S. 910 (1989); <u>Coleman</u> v. <u>Commonwealth</u>, 226 Va. 31, 307 S.E.2d 864 (1983), <u>cert.</u> <u>denied</u>, 465 U.S. 1109 (1984); <u>Smith</u> v. <u>Commonwealth</u>, 219 Va. 455, 248 S.E.2d 135 (1978), <u>cert.</u> <u>denied</u>, 441 U.S. 967 (1979).

Our examination of these decisions, as well as capital cases resulting in life imprisonment, demonstrates that the defendant's sentence of death is neither excessive nor disproportionate when compared to sentences generally imposed by sentencing bodies in this jurisdiction for comparable or similar crimes.

X.

Having reviewed the sentence of death, finding no reversible error in the record, and perceiving no reason to commute the death sentence, we will affirm the judgment of the circuit court.

42

<u>Affirmed.</u>